Argued 20 June; decided 31 July, 1899.

STANLEY *v.* LUSE.

[58 Pac. 75.]

Corporations—Fraudulent Purchase by Director.—Defendant, being the owner of the good will and part of the plant of a newspaper, organized a corporation with his father, who owned the rest of the plant, and an employee to whom he was indebted, and secured control of a majority of the stock, electing himself and two friends as the board of directors. Thereupon he and his

father made an apparent sale of everything connected with the paper to a third person, and afterwards, defendant, as agent of the corporation, purchased the same property for that organization at a fair price, without disclosing that he still had an interest in it. The other two directors were entirely under defendant's control. *Held*, that the sale was constructively fraudulent and should be set aside.

FRAUDULENT PURCHASE BY DIRECTORS.—A purchase by the directors of a corporation, in its behalf, of property in which they have an interest, without disclosing that fact, is constructively fraudulent, at the instance of a stockholder, regardless of the price paid and its relation to the true value of the property.

CORPORATIONS—POSITION OF DIRECTOR.—A director sustains toward his corporation a position of peculiar trust, and, in conducting a purchase for his corporation, he cannot ordinarily take property in which he is personally interested, though, if the holders of a majority of the stock understand the situation and approve the proposition, he may, if the transaction is entirely fair: *Jones* v. *Hale*, 32 Or. 465, distinguished.

RIGHT OF STOCKHOLDER TO AVOID FRAUDULENT CONTRACT.—A stockholder of a corporation has the right to disavow and have annulled a purchase by the directors, made on behalf of the corporation, of property in which they were personally interested, where their relation to the property was not disclosed at or before the purchase, notwithstanding there was no actual fraud, and the price was not excessive.

CORPORATIONS—RATIFICATION OF ACTS OF DIRECTORS.—Such a proceeding might be ratified by the stockholders, but where no meeting of stockholders has been called to ratify the purchase by the directors, the fact that the owners of a majority of the stock are known to favor the action does not amount to such ratification.

EQUITABLE ESTOPPEL—SUIT TO SET ASIDE SALE.—Where the minority stockholders of a corporation object to a purchase for it by the directors from the time of its consummation, and within reasonable time file a suit to set it aside, no ratification by estoppel can be inferred.

CORPORATIONS—VOID CONTRACT BY DIRECTORS.—A purchase of property for a corporation by its directors is voidable *in toto* if any part of it is tainted with fraud, either express or constructive, by reason of the directors' personal interest in the property, and their failure to disclose it.

ACCOUNTING BY DIRECTORS.—In a suit to set aside a purchase by the directors of a corporation on the ground of fraud, the directors cannot be required to account for salaries received and money expended in carrying on the corporate business; that can be done only in a suit to wind up the affairs of the corporation.

From Coos : J. C. FULLERTON, Judge.

Bill in equity by J. J. Stanley and others against J. A. Luse and others. From a decree setting aside a purchase by defendants, as directors of the corporation, and calling in defendant's stock, defendants appeal.        MODIFIED.

For appellants there were briefs over the names of *J. W. Hamilton*, *D. L. Watson*, *D. L. Watson, Jr.*, and *Lewis B. Cox*, with an oral argument by *Mr. Cox*.

For respondents there was a brief and an oral argument by *Mr. S. H. Hazard*.

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

The following is a brief narrative of the facts giving rise to the present litigation, as disclosed by the evidence: Prior to 1892, J. D. Garfield, J. M. Siglin, A. W. Sefton, and W. A. Luse were engaged in the publication of a newspaper called the Sun, and constituted what was known as the Sun Publishing Company. Individual members dropped out, one after another, until W. A. Luse was left as the sole proprietor. In May, 1892, Luse permitted his son, J. A. Luse, who had theretofore been employed upon the paper, to take charge, and thereafter he assumed the control and management of the same as its publisher and proprietor. At first he had the use of a plant belonging to the Southern Oregon Company, but shortly secured the use of what is known as the "Minnesota Plant," then owned by W. S. Vanderburg and others, and this he has ever since, either by himself or in the name of the Sun Printing Company, continued to employ in the publication of the paper. He payed some consideration for its use, but its nature or amount is not definitely shown. Some time prior to August, 1894, the owners of the plant, upon terms then stated, proposed to buy Luse's interest in the concern, consisting of some furniture, office fixtures, type, and other materials used in connection with the business, which he had meanwhile acquired independently of the plant, together with his subscription list and good will, accompanying the proposition with a threat to take the plant away from him. He refused to

accede to the terms proposed, but the negotiations induced thereby resulted in the purchase of the plant by W. A. Luse on August 25, 1894. The consideration paid was $1,184.46, to raise which he gave his note, secured by mortgage, to Flanagan & Bennett, and J. A. Luse continued as before in the use of the plant. The promoters of the Sun Printing Company, the most prominent among whom was J.A.Luse, while soliciting subscriptions to the stock of the concern, represented that the purpose of the organization was to purchase the Sun newspaper, the plant, subscription, good will, etc., and to continue its publication by said company. When sufficient stock had been subscribed for the completion of the organization, a stockholders' meeting was called for January 19, 1895. In the meantime the question of displacing J. A. Luse as editor and manager began to be mooted, and a controversy arose for the control of a majority of the stock, resulting in the success of J. A. Luse, and the election of himself, M. A. McLeod, and Thomas Howard as directors. It was sought to elect five directors, but this was overruled, and the number fixed by the stockholders at three.

The capital stock of the corporation was fixed at $2,000, divided into two hundred shares of $10 each ; and, when the stockholders' meeting was finally held, the stock had all been subscribed. J. A. Luse had subscribed for thirty shares, McLeod for forty, and Howard twelve. The latter subscribed for ten of these at the instance of Luse, who agreed to pay for the same, and take an assignment to himself. S. C. Giles, William Current, B. C. Lemonoskie, Wrenshall Brothers, John Yoakam, J. C. Ward, and W. L. Walker subscribed two shares each, and J. N. Phillips five shares, with a like understanding. These, together with the shares subscribed by Luse, McLeod, and Howard, constituted a majority of one of all the stock in

the concern.  The directors organized by electing How-
ard as president, Luse secretary, and McLeod treasurer.
Thereafter some discussion arose among the stockholders
regarding the price which should be paid for the plant,
materials, etc., and Luse represented to some of them
that, before consummating the purchase, the directors
would call a meeting of the stockholders to determine
the matter.    On March 13, 1895, W. A. Luse made a pre-
tended sale and transfer of the Minnesota plant to E. G.
Flanagan for the consideration of $1,200, and Flanagan
executed his note for the purchase price ;  and on the
same day J. A. Luse made a like pretended sale and
transfer of the furniture, fixtures, type, and other ma-
terials used in connection with the publication of the Sun
newspaper, and the subscription and good will thereof, to
said Flanagan, for the sum of $800, and took his note
therefor.    Three days thereafter, Luse and McLeod, act-
ing as directors of the Sun Printing Company, resolved
to purchase the said plant, subscription list, good will,
etc., from Flanagan for $2,000 ;  and, acting upon this
resolution, J. A. Luse contracted with Flanagan for the
purchase thereof, who thereupon transferred the property
in question to the Sun Printing Company.    Luse and
McLeod, prior to this meeting, endeavored to obtain the
attendance of Howard, the other director, but he refused
to meet or act with them in the purchase of said property
without first having the assent of the stockholders, duly
obtained at a meeting called for that purpose.    Luse and
McLeod thereupon gave him notice of the said directors'
meeting, and, he not appearing, they proceeded to resolve
upon the purchase in his absence, and without any meet-
ing of the stockholders having been called prior to the
action thus taken.    McLeod had been in Luse's employ
since about May, 1892, in connection with the publication
of the Sun, and Luse had become indebted to him to the

extent of $400, or more, and had agreed to pay for his stock in the concern, and in that way discharge said indebtedness to the amount of such stock.

In part payment of the $2,000 consideration, J. A. Luse surrendered the Flanagan note for $800, and McLeod, acting in the capacity of treasurer of the board of directors, drew a check upon the bank for $600, which was indorsed by Flanagan & Bennett upon W. A. Luse's said note for $1,184.46. A little later—on April 13—another check was drawn for $140, and a like indorsement made upon the note. Two other payments were subsequently made by Luse—one on September 14, 1895, for $88.30, and one October 7, 1895, for $50—and indorsed upon the same note. These two last amounts do not appear to have been paid out of the fund acquired from subscriptions to the capital stock. J. A. Luse testifies that at the time of the purchase he paid Flanagan $1,730 in checks and orders, and gave him the company's note for $270, aggregating $2,000, the amount of the consideration agreed upon. There was but $770 in cash paid upon the stock subscription, of which $740 was paid to Flanagan by the treasurer. The balance of the $1,730, or $990, seems to have been adjusted with Flanagan through J. A. and W. A. Luse. This is the equivalent of the stock subscribed by J. A. Luse and at his instance, and McLeod's stock, all of which was carried onto the stock books as paid up, when, as a matter of fact, no cash payments had been made thereon to the company. All such stock, except McLeod's, was either issued to J. A. Luse or assigned to him after its issuance, so that he claims to be the owner and holder of that amount of paid-up stock. These shares, with two of Howard's, constitute a majority of one of all the stock of the concern. Thirteen shares of stock subscribed for by other parties have never been paid. The next issue of the Sun after the Luses

claimed to have sold to Flanagan contained a salutatory
over the name of Flanagan, stating that he had pur-
chasd the paper, and that thereafter the same would be
continued under his management. J. A. Luse, however,
admits that he wrote the article, and in fact continued
in the actual possession and management of the paper.
The next issue contained Flanagan's valedictory. It is
further shown that the $1,200 note given by Flanagan to
W. A. Luse has not been entirely paid off, but that Flan-
agan has it in his possession and under his control, to
prevent its getting into circulation against him; also,
that the price paid for the plant, good will, etc., of the
Sun was fair, and not in excess of its reasonable value.
Under this state of the case, J. J. Stanley, D. F. Dean,
B. F. Ross, W. W. Hayes, and J. H. Schroeder, who
claimed to be the owners of forty-eight shares of the capi-
tal stock, fully paid up, in behalf of themselves and of
all other stockholders similarly situated, on July 20, 1895,
instituted this suit against J. A. Luse, W. A. Luse, M.
A. McLeod, Thomas Howard, E. G. Flanagan, and the
Sun Printing Company for the purpose of setting aside
the sale made to the Sun Printing Company, as afore-
said, declaring the same void, having the stock of the
said Luse and McLeod called in and canceled, the elec-
tion of said directors annulled, and for such other relief
as is proper and equitable.

The parties agree that the suit is, in effect, one by the
corporation, although brought in behalf of certain stock-
holders and all others similarly situated, and that the re-
lief available is such only as would be proper if the suit
had in reality been brought in the name of the corpora-
tion itself. Plaintiffs insist that the purchase by J. A.
Luse and McLeod, acting in the capacity of the directors
of the Sun Printing Company, was essentially a purchase
by trustees of themselves; hence it is claimed that the

transaction was void *ab initio*, and subject to be set aside in a court of equity upon the suggestion and proof of the fact. It is maintained, upon the other hand, that the purchase was only voidable at most, but susceptible of ratification by the stockholders ; and that, while there has been no ratification in fact, the majority is in harmony with the action of the directors, and consequently it is apparent that, if any action had been or should be taken touching the matter by the stockholders, it would lead inevitably to that end, and that these conditions must be considered as the equivalent of an actual ratification, and so treated. The position of plaintiffs is somewhat re-enforced by the fact, as shown by the evidence, that McLeod was acting essentially at the behest of Luse, and was a pliant instrument in his hands for the consummation of the contemplated negotiations. McLeod had long been in the employ of Luse, who was much in his debt, and had agreed to pay for his stock, with the understanding that the amount paid should be credited upon such indebtedness ; so that the accomplishment of Luse's purpose meant the realization of his. In this relationship Luse became the chief actor, and McLeod the subservient agent.

The relation which a director sustains towards the corporation he represents is well understood. His position is of a fiduciary character, and his relationship is that of a *quasi* trustee. Hence it is sometimes asserted that as an individual he cannot deal with the board of directors or trustees of which he is a member ; or, in other words, he cannot deal in such a capacity with the corporation of which he is a trustee. Giving the doctrine its broadest scope, it is said : "A person cannot legally purchase on his own account that which his duty or trust requires him to sell on account of another, nor purchase on account of another that which he sells on his own account;"

and "especially is this the rule with corporate directors:" 2 Cook, Corp. § 652.   Such is undoubtedly the necessary result where a majority of the directors have so dealt with themselves as individuals, or wherein the acts of such majority have been controlled by the individual director dealing with the corporation :  *Coleman* v. *Second Ave. R. R. Co.* 38 N. Y. 201.  This does not absolutely preclude an interested director, however, from dealing or contracting with his corporation, but only from dealing in his official or representative capacity, without special authority, where his individual interests are involved. Thus, in *Gambell* v. *Queens County Water Co.* 123 N. Y. 91 (9 L. R. A. 527, 25 N. E. 201), a director was permitted to contract with his corporation where a majority of the shareholders, being fully apprised of the nature of the transaction, authorized it.   Aside from the condition that Luse had an interest in the property which he assumed to purchase for his company in the capacity of a director, the transaction was one the corporation clearly had the power or authority to consummate.   It was, therefore, not *ultra vires*.   The price paid for the plant, good will, etc., not being disproportionate to the value of the property, the transaction did not constitute an actual fraud against the corporation ;  but, nevertheless, it was such a one that the stockholder had the right to disavow and have annulled upon the establishment of its real character.

As is further said by Mr. Cook in the section above cited :  "The fraud is not an actual one if the director sold at a fair price, and did not use his position to induce the corporation to purchase.   Such a sale, however, is always a constructive fraud, and, unless legally ratified, is voidable at the option of any director or stockholder." Mr. Justice MILLER, in *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587, says :  "That a director of a joint-stock corpora-

36 OR.—3.

tion occupies one 'of those fiduciary relations where his dealings with the subject-matter of his trust or agency and with the beneficiary or party whose interest is confided to his care is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and others. * * * The general doctrine, however, in respect to contracts of this class, is not that they are absolutely void, but that they are voidable at the election of .the party whose interest has been so represented by the party claiming under it. We say this is the general rule, for there may be cases where such contracts would be void *ab initio* ; as, when an agent to sell buys of himself, and by his power of attorney conveys to himself, that which he was authorized to sell. But, even here, acts which amount to a ratification by the principal may validate the sale.'' In further support of the doctrine, see *Gardner* v. *Butler*, 30 N. J. Eq. 702 ; *Stewart* v. *Lehigh Valley R. R. Co.* 38 N. J. Law, 505 ; *Kitchen* v. *St. Louis K. C. & N. Ry. Co.* 69 Mo. 224. The learned justice distinguishes the case thus suggested from that where one director among several has loaned money to the corporation when it is needed, and the transaction is open, and otherwise free from blame ; so that the authorities cited and relied upon, such as *Jones* v. *Hale*, 32 Or. 465 (52 Pac. 311), which have relation to the loaning of money needed in its business engagements by a director to the corporation which he represents, are not apt to the present exigency.

It is no doubt true, therefore, that a transaction of the class involved is susceptible of ratification by the stockholders at a meeting called for the purpose, at which the directors whose private interests had been subserved would have a right to participate as stockholders : *Gamble* v. *Queens County Water Co.* 23 N. Y. 91 (9 L. R. A. 527,

25 N. E. 201) ; *Bjorngaard* v. *Goodhue County Bank*, 49 Minn. 483 (52 N. W. 48) . This rule, however, is not of universal application, for a condition might arise where it would be made apparent that the majority of the stockholders were using their power for the purpose of defrauding the minority. In such a case their acts would be subject to the scrutiny of a court of equity at the suit of the minority. But there has been no ratification here by the stockholders ; nor can we agree with counsel in the position advanced, that, because a majority of the stock is controlled by Luse and McLeod, the fact is in itself equivalent to a ratification: True, a ratification by a corporation of the act done in its behalf may be effectually brought about by conduct *in pais*, and it is not always necessary that a formal vote or resolution of the board of directors or the body of the shareholders be taken to accomplish the purpose. Such conduct may consist either in affirmative action or in the failure to act ; that is, passive acquiescence : 4 Thompson, Corp. § 5286. But this does not meet the case. Affirmative action by the body of stockholders, looking to the approval of the act of the board of directors in making the purchase, is wholly wanting. And what is there in the stockholders' failure to act indicative of such passive acquiescence as will imply ratification? Such a ratification rests on the principle of equitable estoppel, the just conception being that one person, though innocent, ought not to allow another innocent person to rest in the belief that a voidable engagement is valid until the latter has changed his position. It also rests on the moral consideration that the former, after allowing the hopes of the latter to be raised for a considerable length of time in respect of whatever benefits may accrue or may have accrued from the engagement, ought not to be allowed to disappoint those hopes. Thus we have the *rationale;* and

the rule is that, where the agents of a corporation exceed their powers, their principal, being cognizant of the action taken, must, as in the case of a natural person, disaffirm promptly, or at least within a reasonable time, having regard to the circumstances of each particular case : 4 Thompson, Corp. § 5298.   The minority of the Sun Printing Company stockholders have objected to the proceedings from their very inception, and soon thereafter to wit, on July 20, 1895, commenced this suit to set aside the alleged purchase.   The directors have taken no steps to bring about a ratification.   Prior to their action, the majority refused to call a meeting of the stockholders to obtain their sanction to the purchase, and they have subsequently neglected to do it, but have relied implicitly upon the validity of the transaction as it was consummated by and through themselves only.   There has been no unreasonable lapse of time attending the conditions, nor has any one changed his position in reliance thereon; so that all the elements of an equitable estoppel by acquiescence are wanting, and it cannot now be invoked in support of the purchase.

*Bjorngaard* v. *Goodhue County Bank*, 49 Minn. 483 (52 N. W. 48), does not reach this case.   There a meeting of the stockholders had been called for the especial purpose of ratifying an act of the directors, and the suit was brought to enjoin the ratification.   The court ruled that the meeting should not be enjoined, as the stockholders could legally ratify the purchase attempted by the directors, and should have the opportunity to act in the premises.   Nor do any considerations of fairness help the directors in this instance.   GILFILLAN, C. J., in the case just alluded to, says of such a transaction : "It is voidable under the rule that one having authority from another to purchase or sell for him cannot purchase from nor sell to himself.   To do so is in law a fraud.   The rule is abso-

lute, and the matter of fraud in fact is immaterial. The party for whom the purchase or sale is made need not allege nor prove fraud or injury, but may disaffirm, without taking any risk. The rule is inflexible in order to prevent fraud on the part of one holding a fiduciary relation, by making it impossible for him to profit by it; thus removing temptation from his way."

We have treated the case thus far as though the directors had purchased from J. A. Luse. W. A. Luse, who was neither a director nor stockholder, was formerly the owner of the Minnesota plant. He had purchased it, however, to secure its continued use to his son, and whatever he did in negotiating the sale to the Sun Printing Company was for the benefit and at the instance of the son, so that the son was virtually his agent, while acting as agent and director for the corporation on the other hand. Another feature of the transaction is that the purchase through the supposed agency of Flanagan was of the plant, furniture, fixtures, subscription list, good will, etc., as a whole, for the single consideration of $2,000, and was treated as a single transaction; so that, if any part of it is tainted with fraud, either express or constructive, the whole, being incapable of severance, must suffer the same fate. Under these conditions the rule above ascertained and stated has application, so that the attempted sale, as it concerns all of the property, must be set aside and annulled.

Two other questions are involved in the controversy. It is sought, in the first place, to have the stock of Luse and McLeod called in and canceled; and, in the second, to have the election of the directors annulled and set aside. There is no evidence in the record which indicates that the subscription to the stock by Luse, McLeod, and the parties subscribing at the instance of Luse was fraudulent, and hence there has been no case made for canceling

any part of the subscription; nor can the election of directors be disturbed, since the meeting at which they were elected seems to have been regularly called and fairly conducted.

There was some contention that Luse and McLeod should be required to account to the company for their salaries received for services rendered and the moneys received and expended in carrying on the business of the concern. But this is not a suit to wind up the affairs of the corporation, and does not present a case for such relief.

The court below having entered a decree that the plaintiffs have and recover of and from the defendants J. A. Luse, McLeod, and Howard the amount of their subscription, and that they have a lien therefor upon the property involved, we are induced, under the foregoing considerations, to modify such decree. The order here will be that the sale of the plant, good will, etc., by W. A. and J. A. Luse, through E. G. Flanagan, to the Sun Printing Company, be set aside and annulled; that J. A. Luse, M. A. McLeod, and W. A. Luse be required to account to the corporation for the sum of $740, with legal interest thereon from the date of the payment to W. A. Luse; that the Sun Printing Company recover of and from them the amount; and that the appellants recover their costs and disbursements on the appeal.        MODIFIED.

Argued 25 October; decided 13 November, 1899; rehearing denied.