Argued November 6, affirmed December 7, 1972

# WILLIAMS, *Appellant, v.* PILGRIM TURKEY PACKERS, INC., *Respondent.*

503 P2d 710

*Sam F. Speerstra,* Salem, argued the cause for appellant. With him on the brief were Rhoten, Rhoten & Speerstra and Geo. A. Rhoten, Salem.

*John S. Horton,* Albany, argued the cause for respondent. With him on the brief were Weatherford, Thompson, Horton & Jordan, P.C., and James H. Jordan, Albany.

Before McALLISTER, Presiding Justice, and HOLMAN, TONGUE, BRYSON, and THORNTON, Justices.

TONGUE, J.

This is an action for damages by an executive of a corporation against that corporation for breach of a contract under which he was to sell to it at least 20,000 turkeys per year, at a fixed price, over a period of three years. The case was tried before the court, without a jury. After over four days of testimony the trial court entered a judgment for defendant, based pri-

marily upon a finding that at the time of the contract a fiduciary relationship existed between plaintiff and defendant corporation. We affirm.

Plaintiff contends that the trial court erred in holding that the relationship between Williams as an employee and Pilgrim as employer was a fiduciary relationship because: (1) an employee is not, as such, in a fiduciary relation with his employer "as to matters in which he is not employed" and (2) even "as to matters of which he is employed" an agent may deal with his principal "provided the business is open, fair and honest." Plaintiff also contends that even if the agreement was voidable, it was subsequently ratified by Pilgrim.

■ It thus becomes necessary to review the evidence, bearing in mind that in doing so, particularly in instances of conflict in the testimony, the evidence must be viewed in the light most favorable to plaintiff and that the findings and decision of the trial court as the finder of the facts in an action at law must be affirmed if supported by substantial evidence.[1] Accordingly, for the purposes of this review we must include reference to such evidence as tends to support the findings and decision of the trial court, despite the fact that such testimony may have been given by witnesses whose credibility was impeached and despite the fact that considerable testimony to the contrary was offered by defendant.

Pilgrim was organized in August 1958. In January 1959, Williams became general manager of its plant in Salem and continued in that position until its acquisition in 1968 by Smoke-Craft, Inc., an Albany based corporation engaged in the sale of various food

[1] See Cronn v. Fisher, 245 Or 407, 416, 422 P2d 276 (1966).

products, including smoked turkey meat. During 1969 a new and enlarged plant was built in Salem for Pilgrim, based upon preliminary plans prepared by Williams. During that period Williams continued to act as general manager.

When the new plant was opened in January 1970 Dale Brown was installed as its general manager and Williams became sales manager. Williams, however, was the only executive in either Smoke-Craft or Pilgrim with experience in all of the major parts of Pilgrim business, including the procurement of turkeys from growers, the operation of the plant for the processing of turkeys, and the sale of such products. As such, Williams was included in a small management group of Smoke-Craft and Pilgrim executives which held weekly meetings in Albany and he was consulted and relied upon for advice on "all phases" of Pilgrim's operations, including the procurement of turkeys from growers.

Almost immediately after the new plant was opened, it appeared that Pilgrim was in serious financial difficulties and that it might be advisable to sell the new plant. These problems, including possible sale of the plant, were discussed with Williams as early as January 1970 and he assisted in efforts to find a purchaser, which continued during that spring, without success. He also helped secure needed bank financing. The possibility of closing the plant was then discussed, beginning as early as June 8, 1970, at a meeting attended by Williams.

During this same period, however, the same management group was also considering how to procure a large number of tom turkeys for processing at the Pilgrim plant in order to supply Smoke-Craft with

a large quantity of dark turkey meat. Williams was also consulted on this problem and submitted various forms of contracts with growers, based upon his experience. He also recommended that to accomplish that objective a contract should be offered to growers to purchase turkeys at a fixed price of 23¢ per pound (somewhat above competitive prices then being offered) for a period of three years, including a provision that 10% of such turkeys be produced for "off season" purchase and processing, so as to maintain "off season" plant operation and increase total production. Williams also prepared a draft of such a proposed contract for offering to turkey growers. Based largely upon his recommendation, a contract with these three features was then approved by the management group and was offered to various turkey growers, without success. At the meeting on June 8, 1970, the matter of getting growers to sign that contract was again discussed with Williams.

At the same time, Williams was raising over 25,000 turkeys on a farm purchased by him in 1969. His "original plan" was to sell all of the turkeys to Pilgrim and he knew that Pilgrim wanted all the turkeys it could get. As of June 1970, however, he had made no commitment whether to sell them to Pilgrim or to Acme, another large turkey purchaser.

On June 13, 1970, William Mikkleson, president of both Smoke-Craft and Pilgrim, went to Europe until July 15, leaving six signed contracts for Sydney Wells, the Pilgrim field man, to take to growers for acceptance. There was testimony that he did so at the suggestion of Williams. There was also evidence that Wells was a long-time acquaintance and former employee of Williams.

Mikkleson testified, however, that he did not authorize any changes to be made by Wells in that contract. At the same meeting he told William Mitchell, the Smoke-Craft general manager, that while Mikkleson was in Europe Mitchell had authority to shut down the Pilgrim plant. At that time no purchaser had been found for the plant and the Pilgrim union contract expired July 1, 1970.

It was against this background that Williams, on June 22, 1970, after discussions with Wells, the field man, signed one of the contracts for delivery of 20,000 turkeys to Pilgrim. (His remaining turkeys were sold to Acme.) Although this was the first grower contract signed, Wells, for some unknown reason, made no reference to the signing of that contract in his weekly report, although admitting that he should have done so.

The provisions relating to "off season" production of turkeys (one of the reasons for a fixed price, three-year contract) were deleted at the request of Williams. Wells testified that he discussed the deletion with Brown and left a signed copy of the contract on the desk of Brown, the general manager. Brown denied, however, that Wells did so and testified that Wells *later,* in July, asked him about a contract with Williams with such a deletion and that Brown said that such a contract could not be made with Williams.

The next day, at a management group meeting on June 23, 1970, the closing of the Pilgrim plant as of July 1, 1970, was discussed, that being the expiration date of the union contract. Williams was asked for his opinion and opposed the closing. Williams did not, however, state that he had signed a grower contract the day before as the first and only signed grower contract. On June 25th, at the request of management,

Williams submitted a memorandum setting forth reasons why the plant should not be closed on July 1st, or until February 1, 1971, one of such reasons being that "we are obligated legally to honor grower commitments and would invite suits and problems that would be expensive." At that time, however, the only signed contract with any grower was his own contract.

The plant was then not closed on July 1st and on July 23rd a second grower contract for a minimum of 22,500 turkeys during the first year was signed with R. L. Walker Farms. It was the only other written grower contract.

Plaintiff's witnesses testified that the contract with Williams was a matter of common knowledge. This was denied by defendant's witnesses. According to Brown, the Pilgrim manager, he was told by Wells in mid-August that Williams had signed a contract and then looked for, but could not find, such a contract. Shortly after that Brown talked to Williams and said that Williams was in a fiduciary capacity; that Pilgrim should not be required to honor the contract, denied that Pilgrim had a contract with him and said it would not pay Williams the contract price for his turkeys. This was shortly before Williams' turkeys were delivered.

After the Williams' turkeys were delivered, however, Brown gave instructions to pay for them at 23¢ per pound, the contract price, although the Williams' contract still had not been located and Brown said to use the price shown in the Walker contract. At that time the market price was lower than 23¢. Brown testified that at that time he had not seen the Williams' contract and did not believe that it existed, but that

his reasons for paying that price to Williams were that "* * * we had to have Elmer desperately through the most busy holiday season [our "heaviest kill times"] and didn't want to have bad feelings, and wanted him to work for the benefit of the company * * *." Williams was later asked to bring in his copy of the contract. He then did so.

On October 12, 1970, a public announcement was made that the Pilgrim plant would be closed, although the decision to close the plant may have been made previously. On October 5, 1970, however, Brown confirmed to Walker a commitment for turkey poults for 1971.

Subsequently, Pilgrim paid a substantial amount to Walker for cancellation of his contract, as well as the subsequent commitment for poults for 1971, but informed Williams that his contract was invalid because it was not countersigned by Brown, because Williams had known that the plant was to be closed, and because of his fiduciary relationship or conflict of interest. This action was then filed by Williams to recover $40,872 in damages allegedly resulting from the refusal of defendant to honor the contract for the remainder of its three-year term.

1. *There was substantial evidence to support the holding that there was a fiduciary relationship and that the contract was unenforceable.*

■■ It is true, as plaintiff contends (citing 2 Restatement 211, Agency 2d § 390, Commend *d*), that although a fiduciary relationship may exist between an agent and his principal relating to matters within the scope of his agency, an employee or agent is not, as such, in a fiduciary relationship with his employer or

principal "as to matters in which he is not employed." However, an employee or agent may be in such a confidential relationship that he has a duty of disclosure and fair dealing as to all matters. Restatement, *supra* at 211.

■ In this case there was ample evidence which, if believed by the trial judge as trier of the facts, supported his finding and conclusion that there was a fiduciary relationship between Williams and Pilgrim. This evidence included testimony that the scope of Williams' employment was not limited to his duties as sales manager, but extended to his responsibilities as a member of the management group which looked to him and relied upon him for advice relating to the procurement of turkeys from growers, including advice relating to the terms of contracts to be offered to turkey growers and the price to be paid to growers for turkeys. It follows from such testimony that this contract between Williams and Pilgrim for the purchase of turkeys for a period of three years at a fixed price, as recommended to Pilgrim by Williams, was within the scope of his agency or employment and cannot properly be said to involve a matter "as to which he [was] not employed." It also follows from such testimony that Williams had a duty of disclosure and fair dealing as to this entire matter.

It may also be true, as plaintiff also contends (citing *Franck v. Blazier*, 66 Or 377, 383, 133 P 800 (1913)), that even "as to matters of which he is employed" an employee or agent in Oregon is permitted to deal with his employer or principal "provided the business is open, fair and honest" and without concealment or deception. There is authority, however, to support the rule that when a fiduciary relationship

exists between a corporation and one of its officers, directors, employees or agents, that fact of itself may render a contract between such parties voidable by the corporation, at least under some circumstances, although such a contract may be ratified by it. See *Ostlind v. Ostlind Valve, Inc.*, 178 Or 161, 185, 165 P2d 779 (1946). See also *McNiel v. Holmes*, 77 Or 165, 172, 150 P 255 (1915); *Marsters v. Umpqua Oil Co.*, 49 Or 374, 378, 90 P 151 (1907); *Stanley v. Luse*, 36 Or 25, 36, 58 P 75 (1899); Bogert, Trusts & Trustees (2d ed 1960) 476, 480, 519, § 543.

In any event, this court in *U.S. Nat. Bank v. Guiss et al*, 214 Or 563, 331 P2d 865 (1958), held, at 583:

> "When such confidential and trust relationships exist, the burden rests upon the dominant confidant to exercise the utmost good faith and undivided loyalty. The existence of such responsibilities upon the part of the confidant or trustee will warrant the interposition of equity to scrupulously examine every transaction and set it aside if there is an unfair advantage in favor of the person in whom the confidence is reposed." (Citations omitted)

See also *Glaser et al v. Slate Const. Co.*, 196 Or 625, 653, 251 P2d 441 (1952); 3 Fletcher, Cyclopedia Corporations (rev vol 1965) 357-58, 401, §§ 913, 931; 2 Restatement 208-12, Agency 2d § 390 and Comments *c, d* and *g*; and 2 Scott on Trusts (3d ed 1967) 1298, § 170.

■ Again, there was substantial evidence in this case to the effect that Williams had an "unfair advantage" in the negotiation of this contract because of reliance placed by Pilgrim upon his recommendations relating to the price and other terms of that contract. In addition, there was substantial evidence that this

transaction was not "open, fair and honest," but was one involving "concealment or deception" by Williams.

This evidence included testimony that Williams knew that Pilgrim was in financial difficulty and might well have to sell or close its plant; that he suggested that Pilgrim's president sign several form contracts in blank before leaving for Europe; that he then negotiated the contract with the field supervisor, and in doing so omitted a provision relating to "off season" production, which was one of the principal reasons for a three-year contract at such a fixed price; that the field supervisor then failed to report the signing of that contract—the first with any grower—in his weekly report; that the very next day, when the subject of closing the plant was discussed, Williams made no mention of his recently signed contract and that when he was then asked for recommendations on that subject, Williams gave as a reason for opposing the plant closing that "we are obligated legally to honor grower commitments and would invite suits and problems that would be expensive," despite knowledge that the only commitment reduced to written contract was the contract that he had signed the previous day. While we recognize that the credibility of the witnesses who gave some of such testimony was impeached and that there was also conflicting testimony, the credibility of the witnesses who so testified, as well as the inferences to be drawn from such testimony, were for the trier of the fact.

■ For these reasons, and based upon this testimony, we hold that the trial court did not err in finding that a fiduciary relationship existed between Williams and Pilgrim and in holding, in effect, that the contract was not enforceable by Williams against Pilgrim.

2. *There was substantial evidence that Pilgrim did not ratify the contract by payment of the contract price with the intent to ratify the contract.*

Plaintiff contends that even if the contract was voidable or unenforceable because of such a fiduciary relationship, it was nevertheless ratified and reaffirmed by Pilgrim in that after first informing Williams that Pilgrim would not pay the contract price because of his fiduciary capacity, it subsequently paid him the full contract price. Thus, although conceding that an intent to do so is necessary to the ratification of an otherwise invalid contract, plaintiff contends that "where the facts are not in dispute the law conclusively presumes the intent from the person's conduct," citing *Anderson v. Laws et al,* 176 Or 468, 478, 159 P2d 201 (1945), and *Conzelmann v. N.W. P. & D. Prod. Co.,* 190 Or 332, 356, 225 P2d 757 (1950).

Both *Anderson* and *Conzelmann* were cases in which, after discovery of fraud, the wronged party nevertheless entered into a new agreement with the wrongdoer. Aside from that, however, in *Pennicard v. Coe,* 124 Or 423, 433, 263 P 920 (1928), we approved the following rule for application in cases in which acts or declarations are claimed to constitute the ratification of an otherwise invalid contract:

> " 'Any acts or declarations alleged as constituting a ratification of a deed or contract which otherwise might have been rescinded must be shown to have been given or performed with the intention of ratifying it, or they must be of such a nature or tenor that a purpose to ratify may be unmistakably inferred.' "

We also agree with the following rule as stated

in 3 Black on Rescission and Cancellation (2d ed 1929) 1481, § 615:

> "Whether or not a person has acquiesced in the continuance of a contract which he had legal ground to rescind, or has ratified a voidable contract, or elected to affirm it rather than to rescind it, depends primarily upon his intention, and this is to be shown by his declarations, his acts, or his conduct, which are matters of fact. The question is therefore a question of fact for the determination of a jury, in any case at law where it arises, and if a prima facie right to rescind is made out, then the burden of proving acquiescence, waiver, or election to affirm is on the party alleging it. * * *"

While it may be true that under some circumstances an act may constitute such a clear and unequivocal expression of an intent to ratify an otherwise invalid contract as to satisfy the requirements of this rule, we do not believe that such a result must follow, as a matter of law, under the circumstances of this case.

There was evidence in this case that Brown told Williams that Pilgrim would not honor the contract claimed by Williams because of his fiduciary capacity and did so when Brown had not yet seen the contract, as signed by Williams. There is also evidence that even when Brown authorized payment to Williams of 23¢ per pound for his turkeys Brown had not yet seen the Williams' contract, but gave instructions to use the price stated in the Walker contract (the only other three-year contract). In addition, Brown testified that his reason for doing so was that with the "heaviest kill times" approaching Pilgrim "had to have Elmer desperately through the most busy holiday season" and didn't want "bad feelings" to jeopardize his continued service at that time. Finally, there was testimony that

Williams was also subsequently informed that his contract was invalid because of his fiduciary relationship, among other reasons.

■ We hold that in view of such testimony it was a question of fact, to be decided by the trial judge as trier of the facts in this case, whether by payment of the contract price to Williams for his 1970 turkeys Pilgrim intended to ratify and affirm the existence and validity of this three-year contract and that there was substantial evidence to support his finding to the contrary.

For these reasons we affirm the judgment of the trial court.