Argued and submitted January 30, affirmed June 24, reconsideration allowed by opinion October 21, 1987

See 88 Or App 69 (1987)

LUTZ,
*Respondent,*

*v.*

JAWAD & HAIDAR Y. ABULHASAN CO. et al,
*Appellants.*

(A8408-05084; CA A38683)

739 P2d 26

Timothy R. Volpert, Portland, argued the cause for

appellants. With him on the briefs were Rodney E. Lewis, Jr. and Ragen, Roberts, Tremaine, Krieger, Schmeer, O'Scannlain & Neill, Portland.

Garr M. King, Portland, argued the cause for respondent. With him on the brief were Daniel M. Ricks and Kennedy, King & Zimmer, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

## WARREN, J.

Plaintiff brought this action for declaratory judgment to interpret the terms of a contract and for breach of contract or, in the alternative, reformation. The case was tried as an action at law to the court, and judgment was entered against both defendants in the amount of $500,000 with prejudgment interest and attorney fees. We affirm.

Plaintiff was sole owner of Interland, a real estate holding company.[1] Interland owned Lutz Development Company, which in turn owned a subdivision, Grenelefe. In September, 1981, plaintiff agreed to sell his stock in Interland to Jawad & Haidar Y. Abulhasan Co. (Jawad).[2] In March, 1982, plaintiff, Jawad and Interland, acting for itself and its subsidiary corporations, entered into an Amended Interim Agreement (Agreement) concerning the sale of plaintiff's stock to Jawad.[3] Under its terms, plaintiff was to receive $512,217.48 over a period of time. An additional $500,000 payment to him was dependent on proceeds from the sale of the Grenelefe lots reaching $3,000,000.[4] In one part of the Agreement, Jawad agreed to pay the additional $500,000 "from the profits, if any, from the sale of lots in the Grenelefe Subdivision" and in another part it was agreed that the "proceeds from such sale" would be applied to the payment. All of the lots were not sold until 1985, and by then interest charges on the underlying development loan from a third party negated any profit.

A dispute then arose as to whether interest expenses which accrued after August 31, 1981, should be deducted from the sales proceeds in determining the amount to be paid to plaintiff. If they were, plaintiff would receive nothing; if not, plaintiff would receive the $500,000 as provided in the Agreement. That dispute was the primary issue at trial, and the trial court concluded that only interest up to August 31 should be

---

[1] At the time of sale, Interland was called Lutz Service Corporation. Only the name changed after the sale, and for clarity we refer only to Interland.

[2] Jawad is a company organized under the laws of Kuwait.

[3] The Amended Interim Agreement superseded the original agreement of September, 1981. The parties do not argue that the original agreement is relevant to this appeal.

[4] At the time of the Agreement, 68 out of the 74 lots were unsold.

deducted.[5] On appeal defendants do not challenge that determination or the determination that Jawad is liable. They contend, rather, that the trial court erred in finding Interland obligated to pay the $500,000.

The dispute centers around the interpretation to be given these parts of the Agreement:

"a.   [Jawad] will purchase from [plaintiff] all of the issued and outstanding capital stock of [Interland] for a total purchase price not to exceed $1,012,217.48 interest and principal to be paid to [plaintiff][6] by Buyer as follows and *subject only to the conditions described in subparagraph b hereof.* There shall be paid to Lutz by [Jawad] the following payments (totaling $512,217.48 interest and principal):

"\* \* \* \* \*

"Said payments described hereinabove shall be paid by [Jawad] to [plaintiff] as and when due and are subject to no conditions other than the execution of this Agreement. In addition to said payments, [Jawad], *subject to the conditions set forth in subparagraph b hereof, shall pay to [plaintiff] the additional sum of $400,000 plus interest not to exceed $100,000 from the profits,* if any, from the sale of lots in the Grenelefe Subdivision described in Exhibit F attached hereto.

"b.   *Lutz Development Co., a wholly owned subsidiary of [Interland],* is the owner of:

"Blocks 1, 2 and 3 Grenelefe, in the City of Lake Oswego, County of Clackamas, State of Oregon, consisting of 74 lots,

"subject to certain liens and encumbrances described in Exhibit G attached hereto.

---

[5] Defendants also claim that the trial court erred in holding that plaintiff did not breach a fiduciary duty of disclosure to defendants. They claim that plaintiff represented to them that he interpreted the Agreement to mean that all the interest would be deducted before he received the additional $500,000 and that they acted to their detriment in marketing the lots individually at increased prices instead of by a bulk sale.

The trial court tried this action as one at law. Our review of the affirmative defense is as an action at law. *Williams v. Pilgrim Turkey Packers,* 264 Or 36, 503 P2d 710 (1972). There was evidence to support the court's findings that plaintiff was an officer in name only, that there was no intentional misleading on plaintiff's part and that defendants did not rely to their detriment on their then mistaken belief as to plaintiff's rights under the contract. *See* n 8, *infra.*

[6] The Agreement states that the price would be paid to "Lutz [Interland]." The paragraph as a whole shows the parties intended payment to plaintiff.

"The parties believe (although they do not warrant) that the property has a value in excess of $3,000,000, and [Jawad] agrees that, if the parties' opinion concerning the value of said property is correct and if said property is sold for an amount sufficient to pay all encumbrances, costs of sales and other amounts set forth hereinbelow, then [plaintiff] will not be paid the full value of his shares of stock with only the payments referred to hereinabove and that his shares in such event will have a value of an additional $400,000. *[Jawad] agrees, in such event, to pay to [plaintiff] an additional $400,000 for his shares,* together with interest thereon at the rate of 12 percent per annum from the date hereof; provided, however, that interest on said $400,000 shall in no event exceed $100,000. *Said payment or payments shall be made as provided hereinbelow.*

"*[Jawad], [Interland] and [plaintiff] agree that they will use their best efforts to sell the remaining and unsold lots* which constitute Grenelefe at their market value. *Proceeds from such sale shall be applied first* to the retirement of the mortgage indebtedness on said property due to Benj. Franklin Savings and Loan Association of Portland pursuant to the terms and conditions thereof, then to sales commissions, escrow fees and other costs of sales of said lots, *then to expenses incurred by [Interland] in the development, advertising, preparation for sale of said lots, debt service on said lots, together with interest accrued as of August 31, 1981, and all other expenses attributable to the ownership of Grenelefe.* After said amounts shall have been *paid from the proceeds of the sales* of lots in Grenelefe, *then the remaining proceeds,* if any, shall be applied as follows:

"(1)   The first $400,000 plus interest (not to exceed $100,000) shall be paid to [plaintiff];

"(2)   All remaining profits from the sale of Grenelefe shall be divided equally between [plaintiff] and [Interland] until [plaintiff] has received an additional $355,782.52, after which all such profits shall be the sole property of [Interland]." (Emphasis supplied.)

█    We agree with the trial court that the contract is ambiguous as to the obligation for payment of the additional $500,000. Plaintiff, Interland and Jawad are all parties to the amended Agreement, which provides for a contingent payment to plaintiff tied to sales in the Grenelefe Subdivision. It is clear that Jawad assumed the obligation to make that payment. It is not clear that Jawad alone assumed the obligation to pay plaintiff.

Defendant argues that when the four corners of the contract are considered, clearly Jawad is the only party obligated to pay. Because the parties were uncertain as to the value of Grenelefe, it asserts that subsection 1.b. only provided the formula by which Jawad could determine the conditions of payment.

We do not agree that subsection 1.b sets out only a formula. From the language of that subsection the trial court could conclude that the parties treated the proceeds from the sale of the subdivision as a separate source for payment *and* that the subsection establishes priorities for application of proceeds: they are first to be applied to interest payments and then to marketing obligations; next, the $500,000 obligation to plaintiff is to be paid; after those amounts are paid "profits" will be realized. Profits are first shared equally between plaintiff and Interland and then become the sole property of Interland.

Jawad and Interland are treated as separate entities in the Agreement. Interland contracted "acting for itself and its subsidiaries." Interland agreed to help market Grenelefe. The contract provides for reimbursement to Interland for expenses in marketing the developments.[7] The parties treated Interland as responsible for the Grenelefe transaction. In May, 1983, Sayed M. Sadek of Jawad sent a memo to plaintiff stating, in part:

> "Further, I have considered your offer for settlement of property and debts. Interland is not in a position nor willing to repurchase your contingent profit 'equity' in Grenelefe nor in Summer Lake Phase IA lots. Interland does intend to meet its contract obligations to you and expects the same from you."

Interland, through its subsidiary, Lutz Development Co., owned Grenelefe and under the Agreement had rights and obligations with respect to the distribution of the proceeds of the sale. Accordingly, the trial court could find that Interland was obligated to pay plaintiff from the proceeds and that Interland ignored its obligation to see that the proceeds were properly divided with Lutz, thereby permitting the fund to be

---

[7] A projection of the Grenelefe project in May or June of 1982, addressed reimbursements to Interland for advances made to pay interest on the underlying loan.

exhausted. That view of the evidence being permissible, the trial court did not err in holding Interland liable.

Defendants urge, however, that there is no reason why Interland would want or need to pay for its own stock. They argue that Interland was a cash poor company on the brink of financial collapse and that plaintiff could not have expected Interland to pay him. They contend that Interland had specific obligations under the Agreement and that, if the parties had intended Interland to be obligated to pay plaintiff, they would have so stated. We disagree that that is necessarily true. Precisely because Interland was cash poor, the parties could have decided that the Agreement should provide for an identified fund from which plaintiff could be paid. Interland, as well as plaintiff and Jawad, contracted mutually to promote Grenelefe, and all took an element of risk until $3,000,000 had been realized. The court could find that, once the $3,000,000 had been reached, plaintiff's risk in the venture would end. At that point, he was entitled to be paid from the proceeds.

Because Interland used the funds derived from the sale of Grenelefe otherwise, the fund was not available to pay Lutz. Interland undertook to sell the lots partly in order to provide a fund from which Lutz was to be paid, and the Agreement may be construed to mean that Interland undertook to ensure that Lutz would be paid from the fund. Accordingly, Interland may be held liable to Lutz for those payments. The fact that payments to him might have required that payment on underlying obligations come from other sources did not relieve Interland of its obligation to comply with the agreement.[8]

■    Defendants assign error to the award of prejudgment interest, arguing that plaintiff did not plead or prove facts to establish grounds for recovery.[9] Defendants do not dispute

---

[8] Defendants contend that the trial court erred in rejecting their affirmative defense that plaintiff was equitably estopped from contending that the *post*-August 31 interest should not be subtracted. There is evidence to support the court's finding that plaintiff did not make a false representation and that defendants did not rely on the alleged misrepresentation. *See Bennett v. City of Salem,* 192 Or 531, 541, 235 P2d 772 (1951); *see* n 5, *supra.*

[9] A judgment was entered on December 31, 1985. An amended judgment *nunc pro tunc* to December 30, 1985, was entered on January 22, 1986, and allowed prejudgment interest. Defendants argue that the trial court should not have amended the pleadings after the first judgment had been entered, citing *U.S. Nat'l Bank v. Smith,* 49 Or App

that recovery was for the liquidated amount of $500,000. Defendant Interland stipulated to the dates from which prejudgment interest, if available, would run. The existence of an ascertained amount and a specific time from which interest should run entitled plaintiff to recover prejudgment interest. *Public Market Co. v. Portland,* 171 Or 522, 625, 130 P2d 624, 138 P2d 916 (1943).

Although plaintiff did not make a formal motion to amend the pleadings, he had raised the issue of prejudgment interest when the court was considering whether to try the case as one in equity or at law. Plaintiff submitted a proposed form of judgment after trial seeking prejudgment interest. There was no surprise to defendants nor prejudice to the presentation of their defense by the trial court's treatment of the pleadings as if they had been amended. The court did not err in allowing prejudgment interest.

Affirmed.

---

289, 619 P2d 921 (1980), *modified on other grounds* 292 Or 123, 637 P2d 139 (1981). *U.S. Nat'l Bank* relied on ORS 16.390, which has been repealed. ORCP 23B now specifically states that amendment of the pleadings may be made after judgment.