Argued and submitted September 12, 2017; affirmed on appeal, cross-appeal
dismissed as moot April 29, 2020

DEEP PHOTONICS CORPORATION,
a Delaware corporation,
*Plaintiff,*

*v.*

Joseph G. LaCHAPELLE et al.,
*Defendants.*

James FIELD
and Joseph G. LaChapelle,
*Third-Party Plaintiffs-Respondents
Cross-Appellants,*

*v.*

Dong Kwan KIM,
*Third Party Defendant-Appellant
Cross-Respondent,*

*and*

DAEHONG TECHNEW CORPORATION,
a Korean corporation, et al.,
*Third-Party Defendants.*

Washington County Circuit Court
C114435CV; A158705

466 P3d 660

This appeal concerns claims brought by shareholders Joseph LaChapelle and
James Field (plaintiffs) on behalf of Deep Photonics Corporation (DPC) against
three directors of DPC (defendants). In the trial court, a jury found, among other
things, that defendants breached their duty of care to DPC and its shareholders
twice. The jury found that the second breach had caused DPC and its common
stock to decrease in value by $10 million. Defendant Dong Kwan Kim appeals.
*Held*: The trial court did not err in allowing plaintiffs' shareholder derivative
claims to be tried to a jury. The court did not abuse its discretion in denying
defendants' midtrial request to raise and rely on a provision in DPC's certificate
of incorporation to exculpate them from damages for breaches of the duty of care.
The court did not err in imposing joint and several liability.

Affirmed on appeal; cross-appeal dismissed as moot.

Donald R. Letourneau, Judge.

Kevin H. Kono argued the cause for appellant-cross-respondent. Also on the briefs were P. Andrew McStay, Jr., and Davis Wright Tremaine LLP.

Jeff S. Pitzer argued the cause for respondents-cross-appellants. Also on the joint briefs were Pitzer Law, Charles J. Paternoster, and Parsons Farnell & Grein, LLP.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.*

SHORR, J.

Affirmed on appeal; cross-appeal dismissed as moot.

James, J., concurring in part, dissenting in part.

_____

* Ortega, P. J., *vice* Wollheim, S. J.; Shorr, J., *vice* Garrett, J. pro tempore; James, J., *vice* Hadlock, J. pro tempore.

**SHORR, J.**

This appeal concerns claims brought by shareholders Joseph LaChapelle and James Field (plaintiffs)[1] on behalf of Deep Photonics Corporation (DPC) against three directors of DPC: Dong Kwan Kim, Roy Knoth, and Bruce Juhola (jointly, defendants).[2] Kim is the only appellant. In the trial court, a jury found, among other things, that defendants breached their duty of care to DPC and its shareholders twice. The jury found that one of the breaches of the duty of care had not resulted in damages but that the other breach had caused DPC and its common stock to decrease in value by $10 million. The jury apportioned the damages between defendants. The trial court entered a judgment reflecting that verdict and making defendants jointly and severally liable for the damages.

On appeal, in eight assignments of error, Kim argues that the trial court erred in (1) denying his motions for directed verdict and judgment notwithstanding the verdict, (2) allowing the claims to be tried to a jury, (3) denying his request, made midtrial, to raise and rely on a provision in DPC's certificate of incorporation that prohibits an award of money damages against a director for breach of the duty of care, and (4) imposing joint and several liability for the awards against the three directors. In a cross-appeal that

---

[1] Joseph LaChapelle and James Field are third-party plaintiffs in this action. For purposes of this opinion, we refer to them as plaintiffs throughout.

[2] This action began when DPC alleged claims against LaChapelle and Field, among others. DPC's claims were dismissed, and they are not at issue in this appeal.

In the same action, LaChapelle and Field also brought direct and derivative claims against DPC's attorney, Brill, and his law firm. In our opinion on a previous appeal, we addressed issues related to those claims. *See Deep Photonics Corp. v. LaChapelle*, 282 Or App 533, 536, 385 P3d 1126 (2016), *rev den*, 361 Or 524 (2017). The claims against Brill and his law firm also are not at issue in this appeal.

LaChapelle and Field also asserted direct and derivative claims against another director of DPC, Theodore Alekel. Before trial, those claims were severed from the claims against Kim, Juhola, and Knoth and, ultimately, they were dismissed. Those claims also are not at issue in this appeal.

Finally, LaChapelle and Field also alleged direct claims—as opposed to derivative claims on behalf of DPC—against defendants and against Daehong Technew, a Korean corporation of which Kim is the majority shareholder. The trial court dismissed those claims before trial, and they likewise are not at issue in this appeal.

plaintiffs ask us to address only if we conclude that a new trial is necessary, plaintiffs assign error to the trial court's use of a verdict form indicating that breaches of the duty of loyalty by a majority of the board could be excused by the vote of a single disinterested board member.

At the outset, we reject without further discussion Kim's assignments of error regarding the trial court's denial of his motions for directed verdict and judgment notwithstanding the verdict. As explained below, we also conclude that the trial court did not err in allowing plaintiffs' shareholder derivative claims to be tried to a jury, that the court did not abuse its discretion in denying defendants' midtrial request to raise and rely on the exculpation provision in DPC's certificate of incorporation, and that the court did not err in imposing joint and several liability. Accordingly, we affirm, and we do not consider plaintiffs' cross-appeal.

## RIGHT TO A JURY TRIAL

We begin with Kim's seventh assignment of error, in which he contends that the trial court erred in allowing plaintiffs' shareholder derivative claims to be tried to a jury. DPC is a Delaware corporation and, consequently, the parties agree, its internal affairs are regulated by Delaware law. *See* ORS 60.714(3) ("This chapter does not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state.").

Kim argues that, under Oregon law, a shareholder derivative suit is equitable in nature and, consequently, must be tried to a court, not a jury. Alternatively, he contends that, if there is a right to a jury trial under Oregon law, Delaware law should apply because Delaware law is the substantive law that applies in the case and the right to a jury trial is substantive under conflict-of-laws principles. Kim contends, and plaintiffs do not dispute, that there is no right to a jury trial on shareholder derivative claims for breach of fiduciary duty under Delaware law.[3]

---

[3] Delaware's court of equity, the Delaware Court of Chancery, sits without a jury. *See Preston Hollow Capital LLC v. Nuveen LLC*, 216 A3d 1, 12 n 64 (Del Ch 2019) ("[T]o the extent a jury in the Court of Chancery is not extinct

Plaintiffs respond that the nature of the relief sought controls whether a party has a right to a jury trial under Oregon law; they assert that, here, they brought a claim for damages and, thus, they were entitled to a jury trial. In response to Kim's alternative argument, plaintiffs assert that the right to a jury trial is a procedural matter and, thus, under conflict-of-laws principles, it is governed by the law of the forum state, here, Oregon.

We begin by considering whether plaintiffs had a right to a jury trial under Oregon law. To evaluate whether a party is entitled to a jury trial on a given claim, we employ a two-step process: First we consider whether the legislature has provided a jury trial by statute; second, if it has not, we consider whether the constitution provides a right to a jury trial. *Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 322 Or 406, 414, 908 P2d 300 (1995), *modified on recons*, 325 Or 46, 932 P2d 1141 (1997); *see also Foster v. Miramontes*, 352 Or 401, 404, 287 P3d 1045 (2012) (engaging in the same two-step analysis).

Here, because the parties agree that the substance of the claims at issue comes from Delaware law, they have cited no relevant Oregon statutory provisions governing the claims. To the extent that Delaware law might be relevant to our statutory analysis under Oregon law (which neither party argues that it is), no Delaware statute provides for a right to a jury trial on shareholder derivative claims because, as noted above, 303 Or App at 702 n 3, those claims are heard in Delaware in a separate court of chancery, where there is no jury procedure at all. *See Preston Hollow Capital LLC v. Nuveen LLC*, 216 A3d 1, 12 n 64 (Del Ch 2019) ("[T]o the extent a jury in the Court of Chancery is not extinct [because, historically, the court could empanel an advisory jury], it is a vestigial structure."). Accordingly, for

---

[because, historically, the court could empanel an advisory jury], it is a vestigial structure."). Shareholder derivative actions are heard exclusively in the Court of Chancery and, consequently, carry no right to jury trial. *See Aronson v. Lewis*, 473 A2d 805, 811 (Del 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A2d 244 (Del 2000) ("The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it."); *Levien v. Sinclair Oil Corp.*, 300 A2d 28, 30 (Del Ch 1972) (derivative actions are "cognizable only in equity" (internal quotation marks omitted)).

purposes of this opinion, we assume that no statute provides a right to a jury trial on these shareholder derivative claims.

We turn to the second step in the analysis. Article I, section 17, of the Oregon Constitution provides that, "[i]n all civil cases the right of Trial by Jury shall remain inviolate."[4] The Supreme Court "has emphasized that 'the constitutional right of trial by jury is not to be narrowly construed.'" *State v. N. R. L.*, 354 Or 222, 225, 311 P3d 510 (2013) (quoting *State v. 1920 Studebaker Touring Car et al.*, 120 Or 254, 263, 251 P 701 (1927)). "Rather, Article I, section 17, guarantees a right to jury trial for all civil claims or requests for relief, absent a showing that the nature of the particular claim or request at issue is such that it would have been tried to a court without a jury at common law." *Id.* at 226 (citing *Miramontes*, 352 Or at 425). Moreover, "[t]he fact that a particular claim or request was not judicially recognized at the time that the constitution was adopted or that such a claim or request was created by the legislature thereafter does not necessarily mean that Article I, section 17, does not apply; it is the nature of the claim or request that is determinative." *Id.*; *see also 1920 Studebaker Touring Car et al.*, 120 Or at 263 ("[T]he constitutional right of trial by jury is not to be narrowly construed, and is not limited strictly to those cases in which it had existed before the adoption of the Constitution, but is to be extended to cases of like nature as they may hereafter arise.").

Below, the trial court concluded that, in light of the Oregon Supreme Court's reasoning in *Miramontes*, the parties are entitled to a jury trial on shareholder derivative claims under that constitutional provision. As explained below, we agree.

In *Miramontes*, the Oregon Supreme Court considered, and ultimately found persuasive, the United States Supreme Court's mode of analysis for jury trial rights under

---

[4] Article VII (Amended), section 3, of the Oregon Constitution provides a right to jury trial in "actions at law, where the value in controversy shall exceed $750." That provision was adopted when the Oregon Constitution was amended in 1910. *Miramontes*, 352 Or at 408 n 5. Neither party argues that that provision affects this case differently from Article I, section 17. Accordingly, we assume that it does not.

the Seventh Amendment to the United States Constitution. 352 Or at 415-25. Under that mode of analysis, which the United States Supreme Court adopted in light of the merger of law and equity in the federal system under the Federal Rules of Civil Procedure (FRCPs), a court focuses on the nature of the relief requested to determine whether a case presents a legal—as opposed to equitable—issue. *Id.* at 416-17 (summarizing *Dairy Queen v. Wood*, 369 US 469, 82 S Ct 894, 8 L Ed 2d 44 (1962)). If it does, the parties are entitled to a jury trial on the legal issue, "even if the evident equitable issues [are] the 'basic' issues or the legal issue could be characterized as 'incidental' to the equitable issues." *Id.* (quoting *Dairy Queen*, 369 US at 470). Thus, under the Seventh Amendment, the right to a jury trial "'depends on the nature of the issue to be tried rather than the character of the overall action.'" *Id.* at 418 n 15 (quoting *Ross v. Bernhard*, 396 US 531, 538, 90 S Ct 733, 24 L Ed 2d 729 (1970)).

After summarizing the federal approach, the Oregon Supreme Court considered its case law from before and after 1979, when the Oregon Rules of Civil Procedure (ORCPs) dispensed with the procedural distinctions between law and equity in Oregon. The court concluded, "before the merger of law and equity, this court cited various reasons for upholding an equity court's exercise of jurisdiction over what could otherwise be considered legal claims," including the need for separate trials on the law and equity sides of the courts and "the notion that a plaintiff who improperly joined equitable and legal claims had waived the right of jury trial." *Id*. at 424-25. After the merger of law and equity, however, those reasons no longer justify trying legal claims or issues without a jury:

> "In sum, it is neither necessary nor advantageous to courts or litigants to decide the substantive question of whether a party is entitled to a jury trial based on whether a case is 'essentially' equitable in nature, or whether a court of equity would have had 'incidental' jurisdiction to decide a legal issue as an adjunct to deciding an equitable issue in 1857."

*Id.* at 425. Instead, "the right to jury trial must depend on the nature of the relief requested and not on whether,

historically, a court of equity would have granted the relief had the legal issue been joined with a separate equitable claim." *Id.* Thus, the Oregon Supreme Court adopted the federal approach.

*Miramontes* involved two independent claims that were brought together pursuant to a statute: one claim sought equitable relief—a stalking protective order—and the other sought legal relief—money damages. *Id.* at 403. After adopting the federal issue-by-issue approach to jury trial rights, the Oregon Supreme Court held that the defendant had a right to a jury trial on the legal claim even though it was joined with the equitable claim. *Id.* at 426.

This case presents a slightly different situation: Here, rather than bringing an equitable claim and a legal claim, plaintiffs brought a claim that adds a single equitable overlay—the right of the shareholders to bring a claim on behalf of the corporation—to an otherwise legal claim for damages for breach of fiduciary duties. *See Kollman v. Cell Tech International, Inc.*, 250 Or App 163, 171, 279 P3d 324 (2012), *rev den*, 353 Or 410 (2013) (where economic damages were sought on a claim for breach of fiduciary duty, "the nature of the relief sought" required the trial court to try the claim "at law," that is, by jury); *Hoekstre v. Golden B. Products*, 77 Or App 104, 107, 712 P2d 149 (1985), *rev den*, 300 Or 563 (1986) ("[A] shareholder's derivative suit is in equity."); *see also Aronson v. Lewis*, 473 A2d 805, 811 (Del 1984) ("The nature of the action is two-fold. First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it."). Regardless of that distinction, however, the court's holding in *Miramontes* still indicates that a jury trial was required on plaintiffs' claim.

In *Ross*, which the Oregon Supreme Court cited with approval in *Miramontes*, the United States Supreme Court explained that a shareholder derivative action "has dual aspects: first, the stockholder's right to sue on behalf of the corporation, historically an equitable matter; second, the claim of the corporation against directors or third parties on which, if the corporation had sued and the claim

presented legal issues, the company could demand a jury trial." 396 US at 538. Historically, the common-law courts prohibited shareholders from suing derivatively on behalf of the corporation for the corporation's legal claims because the corporation had an adequate remedy at law, namely, the corporation's own legal claim for damages that was triable to a jury. *Id.* at 539. Courts of equity created an exception to recognize the claim in equity where the corporation refused to assert the claim and, therefore, there was no adequate remedy at law. *Id.*

The *Ross* Court explained, "Under the [FRCPs], law and equity are procedurally combined; nothing turns now upon the form of the action or the procedural devices by which the parties happen to come before the court." *Id.* at 540. Noting that the corporation is the real party in interest, receives the proceeds of any judgment, and is bound by the result of the action, the Court explained that "[t]he heart of the [shareholder derivative] action is the corporate claim." *Id.* at 539. Consequently, the Court held, under its issue-by-issue approach to the right to jury trial under the Seventh Amendment, if the corporate claim "presents a legal issue, one entitling the corporation to a jury trial under the Seventh Amendment, the right to a jury is not forfeited merely because the stockholder's right to sue must first be adjudicated as an equitable issue triable to the court." *Id.*

The same reasoning applies under Article I, section 17. As summarized above, in *Miramontes*, the Oregon Supreme Court adopted the issue-by-issue approach to jury trial rights. It did so for the same reason that the United States Supreme Court adopted that approach: the merger of law and equity pursuant to rules of civil procedure. The Oregon Supreme Court explained that, in the post-merger system, "'[t]he availability of jury trial must be separately determined for different issues when a case arises presenting both legal and equitable issues.'" *Miramontes*, 352 Or at 421 (quoting Frederic R. Merrill, *Abolishing Procedural Distinctions Between Actions At Law and Suits in Equity; Right to Jury Trial, ORCP 2*, in Oregon Law Institute, 1980 Civil Procedure Rules 224 (1979)); *see also Cornelison v. Seabold*, 254 Or 401, 406, 460 P2d 1009 (1969) ("[I]t should

be the nature of the particular issue in the proceeding, rather than that of the entire proceeding, which should dictate whether this issue is to be tried with or without a jury.").

We acknowledge that the Supreme Court has held that the right to jury trial does not extend to claims or requests for relief "that, standing alone, are equitable in nature and would have been tried to a court without a jury at common law." *Miramontes*, 352 Or at 425. In 1859, the concept of a shareholder derivative claim, brought in equity, was recognized in some jurisdictions, although, as far as we are aware, no such case was considered by the Oregon Supreme Court until 1899. *See Stanley v. Luse*, 36 Or 25, 38, 58 P 75 (1899) ("The parties agree that the suit is, in effect, one by the corporation, although brought on behalf of certain stockholders and all others similarly situated, and that the relief available is such only as would be proper if the suit had in reality been brought in the name of the corporation itself.").

Unlike most claims historically brought in equity, a claim by shareholders on behalf of a corporation that seeks monetary damages for corporate directors' breach of fiduciary duties does not seek equitable relief or require equitable balancing of a variety of considerations to reach a just outcome. *See, e.g.*, *Frankland v. City of Lake Oswego*, 267 Or 452, 479, 517 P2d 1042 (1973) (when a plaintiff seeks injunctive relief, "[i]t is the duty of the court of chancery to consider and weigh the relative convenience or inconvenience, the relative injury sought to be cured as compared with the hardship of injunctive relief" (internal quotation marks omitted)); *cf. Rebstock v. Lutz*, 39 Del Ch 25, 28, 158 A2d 487, 489 (1960) (noting that a derivative claim for "a money judgment against [corporate managers] based on corporate wrongs" is essentially legal; "[e]quitable jurisdiction in such a case does not rest upon the equitable remedy of accounting; it rests upon the derivative nature of a stockholder's suit"). Rather, as noted, shareholder derivative claims were historically brought in courts of equity simply because law courts did not recognize shareholders, rather than corporate managers, as proper plaintiffs for corporate claims. *Ross*,

396 US at 534. Other than that discrete question of standing, the claims themselves are essentially legal, seeking compensatory money damages for wrongs to the corporation. *Id.* at 538.

Thus, to the extent that shareholder derivative claims can be characterized as claims that existed at common law when the Oregon Constitution was adopted, we nevertheless conclude that the relevant "claim" is the legal claim by the corporation, rather than the easily separated equitable issue of whether corporate shareholders have standing to bring the action on behalf of the corporation. Under *Miramontes*, the proper approach to jury trial rights is to consider the issues in a case on an issue-by-issue basis, with a focus on the relief requested. "To reach a different conclusion would be to import into current practice procedures that may have been necessary at one time but that our legislature has long since abandoned." 352 Or at 425.

We recognize that "[t]he right to a jury trial *** does not extend to cases that would have been tried to an equity or an admiralty court in 1859." *McDowell Welding & Pipefitting v. US Gypsum Co.*, 345 Or 272, 279, 193 P3d 9 (2008). The well-reasoned dissent focuses on the fact that a shareholder derivative claim was tried to an equity court at the time of the Oregon Constitution as a matter of historical practice regardless of the nature of the underlying asserted claim. That narrow historical focus ignores the unique nature of the shareholder derivative claim at issue here. A shareholder derivative claim is unique among claims considered by the Supreme Court to date. As noted above, there is nothing about the underlying claim itself that is equitable in nature or requires the jury to balance equitable factors or exercise discretion. It is only that a law court traditionally would not recognize the shareholder as a proper *party* at the outset of a case—even when the corporation refused to protect the shareholder's rights in a law court—that historically prevented the underlying legal claim from being considered by a jury. The underlying legal claim, however, was a claim that could be tried to the jury.

To ascertain whether the parties are entitled to a jury trial in this case, we look to the pleadings to determine

the nature of each issue presented. *Miramontes*, 352 Or at 426. Here, the issue presented by the corporate claims— breach of fiduciary duty claims seeking money damages— is legal.[5] *See id.*; *see also, e.g.*, *Thompson v. Coughlin*, 329 Or 630, 638, 997 P2d 191 (2000) ("the nature of the relief sought" determines whether a claim is at law or in equity); *Kollman*, 250 Or App at 171 (breach of fiduciary claim seeking economic damages is legal). Accordingly, plaintiffs were entitled to a jury trial on that issue. The fact that the case also required the court to resolve the equitable question of whether plaintiffs had standing to bring the claim on behalf of DPC does not change that conclusion. *See Miramontes*, 352 Or at 425 (adopting federal issue-by-issue analysis); *accord Ross*, 396 US at 542 ("After adoption of the rules there is no longer any procedural obstacle to the assertion of legal rights before juries, however the party may have acquired standing to assert those rights.").

We turn to Kim's alternative argument. As noted above, under Delaware law, there is no right to a jury trial on the claims at issue here. Consequently, Oregon law and Delaware law are in conflict. Kim contends that, as a result of that conflict, we should apply Delaware law.

The parties do not dispute that, under conflict-of-laws principles, "even when foreign law applies, the law of the forum will govern judicial procedures." *Snider v. Production Chemical Manufacturing, Inc.*, 348 Or 257, 261 n 3, 230 P3d 1 (2010) (describing *Equitable Life Assurance v. McKay*, 306 Or 493, 497, 760 P2d 871 (1988)); *see also Restatement (Second) of Conflict of Laws* § 122 (1971) ("A court usually applies its own local law rules prescribing how litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case."); *McKay*, 306 Or at 497 (holding that the *Restatement* rule, set out in section 122, is consistent with its previous cases and adopting that rule). The question here, then, is whether the right to a jury trial is "concerned primarily with judicial administration,"

---

[5] Plaintiffs initially requested equitable relief as well as money damages, but they informed the trial court at the summary judgment hearing that they would not be pursuing equitable relief. Thus, by the time the court considered defendant's objection to a jury trial, only legal relief was at issue.

"relating to the administration of justice." *McKay*, 306 Or at 497-98. If it is, then Oregon law applies. *Id.*

As explained below, we readily conclude that the mode of trial—by judge or by jury—is an issue "concerned primarily with judicial administration" and "relating to the administration of justice." *Id.* at 497; *see also Snider*, 348 Or at 261 n 3 ("judicial procedures" are governed by the law of the forum state; although California law governed arbitration procedures, Oregon law governed "the procedures for taking an appeal from an Oregon circuit court's ruling" on a motion to compel arbitration).

In *McKay*, the Supreme Court held that the general approach of the *Restatement*, set out in section 122— "matters concerned primarily with judicial administration are governed by the law of the forum state"—is consistent with Oregon law. 306 Or at 497 (describing *Restatement* § 122). The court explained that, in the sections following section 122, "the Restatement deals with specific issues" relating to that principle that commonly arise in conflict-of-laws cases. *See Restatement* ch 6, topic 2 (entitled "Specific Applications of General Principle"). The court relied on one of those sections, section 137, which provides that the local law of the forum governs the competency of witnesses and considerations related to their credibility. *McKay*, 306 Or at 497-98 (noting that, under the *Restatement* approach, "[r]ules governing the admissibility of evidence generally are considered to be matters relating to the administration of justice" and relying on section 138 in general and section 137 in particular).

Another of the specific applications of the general principle of section 122 is section 129, which provides that "[t]he local law of the forum determines whether an issue shall be tried by the court or by a jury." That is consistent with the Supreme Court's holding in *McKay* that matters "concerned primarily with judicial administration" are governed by the law of the forum. 306 Or at 497; *see also Central Laborers' Pension Fund v. McAfee, Inc.*, 17 Cal App 5th 292, 346, 225 Cal Rptr 3d 249, 296 (2017) ("While Delaware law in this case supplies the relevant corporate governance general standard of care, we find no basis on which to extend

the internal affairs doctrine to matters properly governed by local forum rules, including \*\*\* mode of trial (jury or bench)." (Internal quotation marks and citations omitted.)).

Kim argues that Delaware law provides substantive rights to application of its unique substantive "standards of review" and to have the trial court explain its reasoning in detail.[6] He argues that only a judge, not a jury, can adequately vindicate those rights. We disagree. As the record in this case shows, the jury can be instructed on the appropriate substantive standard of review and, through a detailed verdict form, can explain its reasoning. Thus, Oregon law governs here, and, under Article I, section 17, plaintiffs had a right to a jury trial on their claims. The trial court did not err in rejecting defendants' objections to a jury trial.

## EXCULPATION PROVISION

Next we address Kim's first, second, and third assignments of error, which all relate to a provision in DPC's certificate of incorporation. 8 Delaware Code section 102(b)(7) allows a certificate of incorporation to contain

"[a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title [relating to unlawful dividends and stock purchases and redemptions]; or (iv) for any transaction from which the director derived an improper personal benefit."

---

[6] Kim also contends that, in *Hust v. Moore-McCormack Lines, Inc.*, 180 Or 409, 424, 177 P2d 429 (1947), the Oregon Supreme Court suggested that the right to a jury trial is substantive, not procedural. To the extent that the court in *Hust* made any suggestion about the right to a trial by jury—as opposed to the question of whether an appellate court can revisit a jury verdict on appeal even in the absence of error—we conclude that the court's later recognition, in *McKay*, that "[t]he determination whether another state's laws should be applied in this state's courts requires more than a classification of those laws as 'substantive' or 'procedural,'" 306 Or at 496, renders the court's comments in *Hust* unhelpful in resolving the issue before us.

DPC's certificate of incorporation contains a provision eliminating the liability of its directors for monetary damages "to the fullest extent permissible under the Delaware General Corporation Law." We refer to that provision as the exculpation provision.

The parties appear to agree that, under a provision like the one in DPC's certificate of incorporation, directors cannot under certain circumstances be held liable for money damages for breaches of their duty of care.[7] The parties disagree as to when, and how, defendant directors must notify the court and the opposing party that they plan to rely on such a provision.

As discussed below, plaintiffs alleged that defendants breached their duty of care, were "grossly negligent," and were uninformed in their business decisionmaking. Defendants did not raise the exculpation provision in their answer. The record indicates that both parties were aware of the provision by the time of defendants' reply in support of their motion for summary judgment, but defendants did not move to amend their answer or otherwise formally raise the provision at that time. Before trial, defendants moved *in limine* to exclude evidence of breaches of the duty of care, basing their argument on the exculpation provision. The trial court did not rule on the motion at that time, concluding that the issue related to jury instructions rather than the presentation of evidence.

During plaintiffs' case-in-chief, defendants moved to introduce DPC's certificate of incorporation, explaining that "[i]t goes to the exculpatory clause issue." The trial court disagreed, explaining, "right now *** that defense, affirmative or otherwise, isn't pled. Remember?"[8] Later in the trial, after plaintiffs had finished presenting their case-in-chief, defendants moved to amend their answer to raise

---

[7] Because, as explained below, we conclude that defendants did not timely raise the exculpation provision, we do not need to address whether the requirements of 8 Del Code § 102(b)(7)(ii)-(iv) are satisfied here; for example, we do not address whether the breaches of the duty of care that the jury identified are exempt from the exculpation provision because they were not in good faith or because the directors derived improper personal benefits from them.

[8] The parties and the trial court had numerous discussions off the record. The court's comments appear to refer to one of those discussions.

the provision as a defense. The court held that the excul-
pation provision was a defense that had to be pleaded and
denied the motion to amend the answer to raise it at that
late date.

On appeal, Kim first contends that defendants did
not have to raise the exculpation provision in their answer;
in his view, defendants were free to raise the provision any
time. Second, he asserts that, even if the exculpation provi-
sion had to be raised in the answer, the trial court abused
its discretion in denying the motion to amend.[9]

We begin by considering Delaware courts' treat-
ment of exculpation provisions under 8 Del Code § 102(b)(7).
The Delaware Supreme Court has explained that "the
adoption of a charter provision, in accordance with Section
102(b)(7), bars the recovery of monetary damages from
directors for a successful shareholder claim that is based
exclusively upon establishing a violation of the duty of
care." *Emerald Partners v. Berlin*, 787 A2d 85, 91 (Del 2001).
"Although a Section 102(b)(7) provision does not operate to
defeat the validity of a plaintiff's claim on the merits, it can
operate to defeat the plaintiff's ability to recover monetary
damages." *Id.* at 92. Because the provision defeats the plain-
tiff's ability to recover damages, a trial on a claim for dam-
ages based exclusively on breaches of the duty of care "would
serve no useful purpose." *Id.* Consequently, "if a shareholder
complaint unambiguously asserts *only* a due care claim,
the complaint is dismissible once the corporation's Section
102(b)(7) provision is properly invoked." *Id.* at 91 (emphasis
in original). That can take place "on a Rule 12(b)(6) motion
to dismiss," on a motion for judgment on the pleadings, or on
a motion for summary judgment. *Malpiede v. Townson*, 780
A2d 1075, 1092 (Del 2001).

By contrast, if a complaint alleges a claim impli-
cating more than only the duty of due care—it implicates
the duty of loyalty or the duty of good faith—an exculpation

---

[9] In his third assignment of error, Kim contends that the trial court "erred
in entering a form of judgment that contained a money award notwithstanding
the exculpation provision." He advances no argument specifically addressing
that assignment of error. Accordingly, we reject it for the same reasons explained
below with respect to his first two assignments of error.

provision does not entitle the directors to dismissal of the claim before trial. *Emerald Partners*, 787 A2d at 93. In that case, "evidence of how the board of directors discharged all three of its primary fiduciary duties" is relevant to the factfinder's analysis. *Id.* As a result, in that situation, "the exculpatory effect of a Section 102(b)(7) provision only becomes a proper focus of judicial scrutiny after the directors' potential personal liability for monetary damages has been established." *Id.* Said another way, if the complaint alleges more than just breaches of the duty of care, the factfinder must determine whether the directors breached their fiduciary duties and, if they did, which duties they breached, and then apply the exculpation provision by eliminating damages for breaches of the duty of care.[10]

As that summary demonstrates, an exculpation provision functions like an affirmative defense. *See id.* at 91-92 (reiterating a previous holding that the provision is "in the nature of an affirmative defense" and noting that "[a]n affirmative defense is '[a] defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's claim, even if all the allegations in the complaint are true'" (quoting *Black's Law Dictionary* 430 (7th ed 1999) (some internal quotation marks omitted))). Although the provision does not technically defeat on the merits a claim implicating only the duty of care, the Delaware Supreme Court has recognized the "practical reality" that it makes such a claim pointless, and, thus, justifies dismissal. *Id.* at 92. That court has also explained that the exculpation provision "must be *affirmatively* raised by the director defendants," *id.* at 91 (emphasis in original), and held that "[d]efendants seeking exculpation under such a provision will normally bear the burden of establishing each of its elements." *Emerald Partners v. Berlin*, 726 A2d 1215, 1223-24 (1999).

From that understanding—an exculpation provision can obviate the need to try a plaintiff's claim; it must be affirmatively raised by the defendants; and the defendants

---

[10]  Those determinations take place as part of an "entire fairness" analysis, in which the factfinder determines whether the challenged transaction was entirely fair to the corporation. *Id.*

In this case, it is undisputed that the complaint contained claims breaches of the duty of loyalty.

bear the burden of establishing its elements—it follows that director defendants must plead an exculpation provision before they can rely on it at trial.[11] *See In re Nantucket Island Associates Ltd. Partnership Unitholders Litigation*, No. Civ.A 17379 NC, 2002 WL 31926614 at *3 (Del Ch Dec 16, 2002) (noting that Delaware Chancery Rule 8(c) requires an answer to set forth "any * * * matter constituting an avoidance or affirmative defense," and explaining that its purpose "is to deal with [possible choices by defendants not to raise defenses like exoneration in motions to dismiss or on summary judgment] by putting the onus on defendants to assert these defenses very early on in the case"); R. Franklin Balotti & Jesse A. Finkelstein, 1 *Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations* § 4.13 (2020) ("The preclusion of a duty-of-care claim pursuant to a Section 102(b)(7) charter provision should be raised as an affirmative defense.").[12]

---

[11] As explained above, defendants can move to dismiss under Delaware Chancery Rule 12(b)(6) based on an exculpation provision. In that limited circumstance, where the motion to dismiss is filed before an answer, the defendants need not first plead the provision in their answer. *Malpiede*, 780 A2d at 1092 ("The Section 102(b)(7) bar may be raised on a Rule 12(b)(6) motion to dismiss (with or without the filing of an answer), a motion for judgment on the pleadings (after filing an answer), or a motion for summary judgment (or partial summary judgment) under Rule 56 after an answer, with or without supporting affidavits." (Footnote omitted.)).

That accords with ordinary procedure for motions to dismiss under Rule 12(b)(6). *See* Del Chancery Rule 12(b) ("Every defense, in law or fact, to a claim for relief in any pleading * * * shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: * * * (6) failure to state a claim upon which relief can be granted[.]"); *accord* ORCP 21(A) ("Every defense, in law or fact, to a claim for relief in any pleading * * * shall be asserted in the responsive pleading thereto, except that the following defenses may at the option of the pleader be made by motion to dismiss: * * * (8) failure to state ultimate facts sufficient to constitute a claim.").

[12] Kim relies on Delaware cases that, he argues, show that defendants are not required to plead or even raise an exculpation provision until late in litigation, just before trial or even on appeal. The cases he relies on do not establish that proposition. In each case, the court notes when the defendants first raised the provision in their arguments or when the trial court or appellate court first addressed the provision in its analysis, but does not address or indicate whether the provision was pleaded. The cases provide no legal analysis of the pleading issue. As explained in the text, in light of the Delaware Supreme Court's repeated statement that an exculpation provision is "in the nature of an affirmative defense," *Emerald Partners*, 787 A2d at 92 (internal quotation marks omitted), and its thorough consideration of the procedural postures in which the provision can be raised, *Malpiede*, 780 A2d at 1092, we conclude that the provision must be pleaded.

The requirement of pleading the exculpation provision is even clearer under Oregon law. ORCP 19 B requires an answer to "set forth affirmatively" a variety of enumerated affirmative defenses and "any other matter constituting an avoidance or affirmative defense." *Accord* Del Chancery Rule (8)(c) (establishing identical requirements). The Oregon Supreme Court recently reiterated what it means to be an affirmative defense: "'[W]here the defendant desires to present evidence which does not directly controvert a fact necessary to be established by plaintiff, it is a new matter which must be pleaded as an affirmative defense.'" *Lasley v. Combined Transport, Inc.*, 351 Or 1, 17, 261 P3d 1215 (2011) (quoting *Deering v. Alexander*, 281 Or 607, 613, 576 P2d 8 (1978)). "This court has defined a 'new matter' as consisting of 'a statement of facts different from those averred by the plaintiff and not embraced within the judicial inquiry into their truth.'" *Id.* (quoting *Hubbard v. Olsen-Roe Transfer Co.*, 110 Or 618, 627, 224 P 636 (1924)). Here, defendants' reliance on the exculpation was a "new matter"; it required evidence that "[did] not directly controvert a fact necessary to be established by plaintiff." *Id.* Accordingly, it had to be pleaded. ORCP 19 B.

We turn to Kim's argument that the trial court abused its discretion in denying defendants' motion, made on the ninth day of trial, to amend their answer to raise a new defense. "[A] trial court has broad discretion in determining whether to allow a party to amend the pleadings." *Ballard v. City of Albany*, 221 Or App 630, 637-38, 191 P3d 679 (2008) (citing *Crandon Capital Partners v. Shelk*, 219 Or App 16, 40, 181 P3d 773, *rev den*, 345 Or 158 (2008)). "In applying that standard, we uphold the trial court's decision unless it exercises its discretion in a manner that is unjustified by, and clearly against, reason and evidence." *Sanford v. Hampton Resources, Inc.*, 298 Or App 555, 577, 447 P3d 1192, *rev den*, 366 Or 64 (2019) (internal quotation marks omitted).

"In evaluating the court's exercise of its discretion, we consider (1) the proposed amendment's nature and its relationship to the existing pleadings; (2) the prejudice, if any, to the opposing party; (3) the timing of the proposed amendment; and (4) the colorable merit of the proposed

amendment." *Id*. (internal quotation marks omitted). Under these circumstances, the court did not abuse its discretion.

Kim contends that the nature and timing of the proposed amendment support his view that the trial court had to allow it. He asserts that it was unjust for the court to penalize defendants for moving to amend their answer so late, because they moved to amend as soon as they learned of plaintiffs' intention to try claims for breach of the duty of care. Kim argues that, in the complaint, plaintiffs did not allege that defendants breached the duty of care; instead, he argues, plaintiffs' theory was exclusively that defendants had conspired to breach their duties of loyalty and good faith.

The problem with that position, as the trial court recognized, is that the complaint alleged breaches of the duty of care. As Kim acknowledges in his opening brief, plaintiffs alleged "that the 'interested directors failed to exercise due care' and that 'in addition to their lack of disinterest,' defendants made 'grossly negligent decisions' because they did not 'fully inform themselves' of" certain relevant facts. (Quoting plaintiffs' complaint.) Those allegations should have put Kim on notice, from the outset, that plaintiffs' theory of the case included breaches of the duty of care.

With the understanding that breaches of the duty of care were at issue from the time plaintiffs filed the complaint, the nature and timing of defendants' proposed amendment weighs heavily against the conclusion that the trial court had to allow it. Midtrial, defendants sought to amend their answer to raise a defense that they could, and should, have raised in their initial answer. Instead of raising it at the beginning of the case, they waited through discovery, through summary judgment, and even through plaintiffs' presentation of evidence at trial. The court was entitled to conclude that it was simply too late to plead an affirmative defense.

To the extent that Kim argues that plaintiffs could not have been prejudiced by the proposed amendment because they knew, at least after defendants' reply on summary judgment, that defendants wanted to rely on the

exculpation provision, we disagree. The trial court found that plaintiffs would have strategized about, shaped, and presented their case differently if defendants had actually raised the exculpation provision early in the case, rather than merely indicating a desire to rely on it, and the record supports that understanding. Even if this is a case in which the court could properly have exercised its discretion to allow a very late amendment, the court did not abuse its discretion by deciding not to allow it.

## JOINT AND SEVERAL LIABILITY

Finally, we consider Kim's eighth assignment of error, in which he contends that the trial court erred in entering a judgment imposing joint and several liability on defendants. He argues that, under Delaware law, directors are jointly and severally liable for breaches of their fiduciary duties only if the factfinder is specifically instructed, and determines, that they acted in concert, aided and abetted, or conspired to breach their fiduciary duties.[13]

"Delaware has long recognized that 'when the negligent acts of two or more persons concur in producing a single indivisible injury, such persons are jointly and severally liable, though there was no common duty, common design, or concerted action.'" *Campbell v. Robinson*, No. 06C-05-176-PLA, 2007 WL 1765558 at *2 (Del Super Ct June 19, 2007) (quoting *Leishman v. Brady*, 2 A2d 118, 120 (Del Super Ct 1938), and citing *Sears, Roebuck & Co. v. Huang*, 652 A2d 568, 573 (Del 1995) ("Multiple defendants may be liable as joint tortfeasors if each defendant's negligence is found to be a proximate cause of a plaintiff's injury.")). The *Restatement (Second) of Torts* section 875 (1979) states the same principle: "Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm."

Here, the jury found that the three directors' negligent acts—which were votes in favor of a particular board

---

[13] In the trial court, the parties agreed that Delaware law controls this issue. Accordingly, we address only Delaware law.

decision—combined to form that single board decision, which caused a single injury to DPC, namely, a loss of value of the corporation and its common stock. The trial court understood the legal principle stated above, applied to those facts, to lead to the conclusion that defendants are jointly and severally liable under Delaware law.

On appeal, Kim has not directed us to any authority indicating that the trial court was incorrect. He points out that no Delaware court has expressly stated that that principle applies to directors' liability for breaches of fiduciary duty. That may be true, but it is not dispositive. Kim does not attempt to distinguish claims for breach of fiduciary duty from other claims involving joint tortfeasors, nor does he present any other contention that persuades us that the general principle does not apply here. Accordingly, we conclude that the trial court did not err in applying joint and several liability.

Affirmed on appeal; cross-appeal dismissed as moot.

**JAMES, J.,** concurring in part, dissenting in part.

Regrettably, I must part ways with the majority when it concludes that the Supreme Court's decision in *Fisher v. Miramontes*, 352 Or 401, 287 P3d 1045 (2012), frees us from the constraints of Supreme Court precedent holding that, under Article I, section 17, of the Oregon Constitution, "[t]he right to a jury trial *** does not extend to cases that would have been tried to an equity or an admiralty court in 1859." *McDowell Welding & Pipefitting v. US Gypsum Co.*, 345 Or 272, 279, 193 P3d 9 (2008). As I will discuss, in 1859, shareholder derivative suits were tried to equity courts. Accordingly, under Supreme Court precedent that has not been disavowed and is still binding on us, Article I, section 17, provides no right to a jury trial in this case. Thus, on that point, I respectfully dissent.

However, I agree with the majority's reasoning and disposition on Kim's remaining assignments of error. But, because I would conclude that the trial court erred in allowing plaintiffs' claims to be tried by jury, I would reverse on Kim's appeal and would also address plaintiffs' cross-appeal. I would conclude that the trial court erred in

allowing a verdict form indicating that the vote of a single disinterested director exonerates a breach of the duty of loyalty by a majority of the board. Accordingly, I would reverse on appeal and cross-appeal.

## RIGHT TO A JURY TRIAL

The majority explains that, in *Miramontes*, the Oregon Supreme Court adopted the issue-by-issue analytical approach to jury trial rights that the United States Supreme Court set out in *Dairy Queen v. Wood*, 369 US 469, 82 S Ct 894, 8 L Ed 2d 44 (1962). That is true, but the majority fails to grapple with the fact that, as *Miramontes* itself acknowledges, that approach is limited to jury trial rights for "newly created" claims, that is, claims that did not exist when the Oregon Constitution was adopted. *Miramontes*, 352 Or at 413. Because shareholder derivative suits were recognized in equity in the first half of the nineteenth century, *Ross v. Bernhard*, 396 US 531, 534, 90 S Ct 733, 24 L Ed 2d 729 (1970), they existed, and were heard in equity, when the Oregon Constitution was adopted. Thus, the Supreme Court's analysis in *Miramontes* does not apply here.

Article I, section 17, provides, "In all civil cases the right of Trial by Jury shall remain inviolate." The Supreme Court has held that two separate analytical categories exist under Article I, section 17. The first consists of civil claims that existed "when the Oregon Constitution was adopted in 1857." *Horton v. OHSU*, 359 Or 168, 243, 376 P3d 998 (2016).[1]

For those claims, the court has consistently reasoned that, by wording Article I, section 17, as they did—"the right of Trial by Jury shall *remain* inviolate"—the framers enshrined then-current "laws and practice" in the constitution. Or Const, Art I, § 17 (emphasis added); *Tribou v. Strowbridge*, 7 Or 156, 158 (1879) ("This language of the constitution indicates that the right of trial by jury shall continue to all suitors in courts in all cases in which it was

---

[1] The Supreme Court has been inconsistent in its statements of whether 1857—when the Oregon Constitution was adopted—or 1859—when it went into effect—is the appropriate date. *Compare Horton*, 359 Or at 243 (citing 1857 as the relevant year) *with McDowell Welding & Pipefitting*, 345 Or at 279 (citing 1859 as the relevant year). For purposes of this case, the difference is immaterial.

secured to them by the laws and practice of the courts at the time of the adoption of the constitution."); *see also, e.g.*, *McDowell Welding & Pipefitting*, 345 Or at 279 ("The right to a jury trial \* \* \* does not extend to cases that would have been tried to an equity or an admiralty court in 1859."); *Moore Mill & Lumber Co. v. Foster*, 216 Or 204, 225, 336 P2d 39, *reh'g den*, 216 Or 258, 337 P2d 810 (1959) ("This court, like others, has recognized that constitutional provisions such as those just cited assure trial by jury in the classes of cases wherein the right was customary at the time the constitution was adopted but do not extend it into other areas."); *Dean v. Willamette Bridge Co.*, 22 Or 167, 169, 29 P 440 (1892) ("This provision of the constitution creates no new right to trial by jury. It simply secures to suitors the right to trial by jury in all cases where that right existed at the time the constitution was adopted."). Consequently, for a claim that existed when the constitution was adopted, Article I, section 17, guarantees a jury trial on the claim if, and only if, "the common law provided a jury trial when the Oregon Constitution was adopted in 1857." *Horton* 359 Or at 243; *see Moore Mill & Lumber Co.*, 216 Or at 225 (the analytical question is whether "the right [to a jury trial] was customary at the time the constitution was adopted"); *accord Miramontes*, 352 Or at 425 ("Article I, section 17, and Article VII (Amended), section 3, of the Oregon Constitution do not guarantee a right to jury trial for claims or request[s] for relief that, standing alone, are equitable in nature and would have been tried to a court without a jury at common law.").

The second analytical category under Article I, section 17, consists of "newly created" claims, that is, claims that did not exist when the constitution was adopted. *Miramontes*, 352 Or at 413. The court's recognition of that category began with its opinion in *State v. 1920 Studebaker Touring Car*, 120 Or 254, 251 P 701 (1926), in which it "rejected the argument that no right to a jury trial attaches to a claim unless there was a firmly established common-law right to a jury trial for that claim in 1857." *Miramontes*, 352 Or at 408 (describing *Studebaker*). The *Studebaker* court explained, "the constitutional right of trial by jury is not to be narrowly construed, and is not limited strictly to those cases in which

it had existed before the adoption of the Constitution, but is to be extended to cases of like nature as they may hereafter arise." *Studebaker*, 120 Or at 263.

Thus, the analytical question for a claim that did not exist when the Oregon constitution was adopted is whether it is "'of like nature' to claims that were triable to a jury at common law." *Miramontes*, 352 Or at 409. Ultimately, as the majority explains, in *Miramontes*, the court adopted the federal issue-by-issue approach to that question. The court explained that "Article I, section 17, and Article VII (Amended), section 3, preserve the right to jury trial for claims that are properly categorized as 'civil' or 'at law'" and a newly created claim "seeking monetary damage for injury inflicted fits within those terms, even if it does not have a precise historical analog."[2] *Id.* at 426.

Thus, I begin by considering which of the two analytical categories includes shareholder derivative claims. That requires me to determine whether shareholder derivative claims existed when the Oregon Constitution was adopted. As the United States Supreme Court explained in *Ross*, in 1791, when the Seventh Amendment was adopted, although a corporation could enforce a legal right at common law, "[t]he common law refused *** to permit stockholders to call corporate managers to account in actions at law." 396 US at 534. Although a corporation could bring legal claims, the right of a shareholder to bring a claim on behalf of a corporation was not recognized at law or in equity in 1791.

"The possibilities for abuse, thus presented, were not ignored by corporate officers and directors." *Id.* As a result, "[e]arly in the 19th century, equity provided relief both in this country and in England." *Id.* The case of *Robinson v.*

---

[2] If the *Miramontes* court had been writing on a blank slate, I would understand its holding more broadly. That is, I agree with the majority that some parts of *Miramontes* can be understood to suggest that Article I, section 17, provides a right to a jury trial on every legal issue, and every claim seeking money damages, in every case. However, as discussed further below, 303 Or App at 725-27 (James, J., concurring in part and dissenting in part) the court recognized that it was not writing on a blank slate, and it did not purport to overrule the long line of case law establishing that, if a claim is one that was tried to an equity court when the constitution was adopted—and thus was not a claim "at law"—then Article I, section 17, provides no right to a jury trial on that claim.

*Smith*, 3 Paige Ch 222 (NY 1832) is commonly credited as the first shareholder derivative suit in the United States. Bert S. Prunty, Jr., *The Shareholders' Derivative Suit: Notes on its Derivation*, 32 NYU L Rev 980, 986-88 (1957) (discussing *Robinson* and earlier cases recognizing aspects of what we now identify as shareholder derivative claims).

The concept in the early American cases, including *Robinson*, was that directors were trustees and stockholders were beneficiaries. "By thus bringing the dispute within the ambit of existing and unquestioned doctrine, [that characterization] provided a ready-made set of substantive rules to govern the directors and at the same time satisfied the requirement of a ground for equitable jurisdiction." *Id.* at 986. The United States Supreme Court first addressed a shareholder derivative suit in *Dodge v. Woolsey*, 59 US 331, 18 How 331, 15 L Ed 401 (1855), applying a similar theory. *Ross*, 396 US at 534. In England, shareholder derivative suits originated in the same general time frame. *See* Prunty, Jr., 32 NYU L Rev at 980 (discussing the leading case of *Foss v. Harbottle*, 2 Hare 461, 67 Eng Rep 189 (Ch 1843), and highlighting earlier cases). All of the cases were heard in courts of equity.

In Oregon, the oldest shareholder derivative suit that I have identified is *Stanley v. Luse*, 36 Or 25, 58 P 75 (1899). There, the Supreme Court noted that "[t]he parties agree that the suit is, in effect, one by the corporation, although brought in behalf of certain stockholders and all others similarly situated, and that the relief available is such only as would be proper if the suit had in reality been brought in the name of the corporation itself." *Id.* at 31. That case was heard in equity. *Id.* at 38.

In the course of evaluating whether jury trials were customary for particular claims when the constitution was adopted, the Oregon Supreme Court has considered the state of the common law (and practices in courts of equity) generally—in the United States and in England—as well as Oregon statutes and cases. *See, e.g.*, *McDowell Welding & Pipefitting*, 345 Or at 282, 285 (citing treatises, an early Oregon case, an early Arkansas case, and an English case in support of its conclusion that only equity courts, not

law courts, would have enforced executory accords when the Oregon Constitution was adopted); *Molodyh v. Truck Insurance Exchange*, 304 Or 290, 295-96, 744 P2d 992 (1987) (citing cases decided in the 1850s in Indiana, Maryland, and New York in the course of deciding "whether plaintiff had a well-established right to have a jury determine the amount of damages in an action on an insurance policy when our constitution was adopted"); *Kendall v. Post*, 8 Or 141, 146 (1879) (citing a national treatise regarding the right to jury trial on the amount of damages resulting from condemnation and noting that "[t]he authorities referred to by [the author], in support of his position, show that this question has been long since settled beyond any doubt or controversy").

Based on the same types of authority, I conclude that the history of the development of shareholder derivative suits in both England and the United States, described above, before the adoption of the Oregon Constitution means that shareholder derivative suits existed when the Oregon Constitution was adopted. As explained above, shareholder derivative suits began to appear in the United States in the 1830s, and only slightly later in England. By the latter half of the 1850s, when our constitution was adopted, they were well established as the means by which shareholders could bring claims against directors and officers on behalf of the corporation. *See, e.g.*, *Dodge*, 59 US at 341-44.

Thus, shareholder derivative suits fall in the first analytical category described above. Consequently, the question under Article I, section 17, is whether a "right to a jury trial was customary at the time the Oregon Constitution was adopted." *Horton*, 359 Or at 173. The answer is that it was not. Shareholder derivative claims were uniformly heard in equity, where there was no right to trial by jury.

The majority does not squarely address the long line of Supreme Court precedent establishing that, for claims that existed when the constitution was adopted, the analysis under Article I, section 17, is based on historical practice. Instead, the majority assumes that the analysis in *Miramontes* applies to all claims, regardless of whether they existed before or after the constitution was adopted. But *Miramontes* was not so far reaching.

The action in *Miramontes*, brought under ORS 30.866, Oregon's civil stalking statute, included a claim for a stalking protective order and a claim for compensatory money damages based on the same facts. 352 Or at 403. The question was whether the defendant had a right to a jury trial on the damages claim, which, in the plaintiff's view, provided a new remedy that was not available at common law. *Id.* The court recognized that the statutory action was newly created—it did not exist at the time of the constitution—and rejected the plaintiff's initial argument that newly created claims never carry the right to a jury trial. The court explained that the question it had to answer was "whether plaintiff's claim for damages in her civil stalking case is 'of like nature' to claims that were triable to a jury at common law." *Id.* at 413. The plaintiff contended that the court should apply a history-based test to answer that question; she argued "that her claim for monetary relief is 'incidental' to what is essentially an equitable claim [for a stalking protective order] and that, because Oregon permitted a court trial of such incidental requests in 1857, it should continue to do so." *Id.* at 419.

In the course of considering the plaintiff's initial argument, the court noted that several of the cases that the plaintiff cited were inapposite to the question before it because "the claims at issue * * * were recognized and triable to a court at common law." *Id.* at 410; *see also id.* at 410 n 6 (summarizing cases). That is, the court in *Miramontes* did not need to address its precedent involving claims that were recognized and triable to a court at common law because it was considering only a newly created claim, for which different analysis applies. *See also Horton*, 359 Or at 226 (describing *Miramontes* as holding that the "state constitutional jury trial right extends to *new causes of action* that are 'of like nature' to claims and defenses that would have been tried to a jury in 1857" (emphasis added)).

Ultimately, the court rejected the plaintiff's argument that it should take a history-based approach to determine whether a newly created claim is "of like nature" to claims that were triable to a jury at common law, holding that "the right to jury trial must depend on the nature of

the relief requested and not on whether, historically, a court of equity would have granted the relief had the legal issue been joined with a separate equitable claim." *Miramontes*, 352 Or at 425.

Thus, in *Miramontes*, the court did not address claims for relief that existed when the constitution was enacted. The court stated that it was addressing what it means for a newly created claim to be "'of like nature' to claims that were triable to a jury at common law," *id.* at 413, and it distinguished cases involving claims that "were recognized and triable to a court at common law." *Id.* at 410. It did not overrule the court's well-established precedent regarding claims that existed when the constitution was enacted.

As an alternative to its suggestion that *Miramontes* applies to all claims, the majority reasons that,

> "to the extent that shareholder derivative claims can be characterized as claims that existed at common law when the Oregon Constitution was adopted, we nevertheless conclude that the relevant 'claim' is the legal claim by the corporation, rather than the easily separated equitable issue of whether corporate shareholders have standing to bring the action on behalf of the corporation."

303 Or App at 709. In my view, the Supreme Court's case law, which is binding on this court, does not allow for the distinction that the majority attempts to draw. The Supreme Court has long held that the framers of the Oregon Constitution intended Article I, section 17, to incorporate "laws and practice," as they existed when the constitution was enacted. *Tribou*, 7 Or at 158. As explained above, when the constitution was enacted, as a matter of law and practice, shareholder derivative suits were brought in equity and, thus, tried without juries. They are not excepted from the Supreme Court's frequently reiterated rule that "[t]he right to a jury trial *** does not extend to cases that would have been tried to an equity or an admiralty court in 1859." *McDowell Welding & Pipefitting*, 345 Or at 279; *see also Miramontes*, 352 Or at 425 ("Article I, section 17, and Article VII (Amended), section 3, of the Oregon Constitution do not guarantee a right to jury trial for claims or request

for relief that, standing alone, are equitable in nature and would have been tried to a court without a jury at common law.").

Thus, I conclude that Article I, section 17, does not guarantee a right to a jury trial on shareholder derivative claims. Because the trial court erred in denying defendant's objection to the claims being tried to the jury, I would reverse and remand. *See Dean*, 22 Or at 169 (remanding for a new trial to the court after the court had empaneled a jury to determine damages after a default, because there was no right to a jury trial on the claims).

## DUTY OF LOYALTY CLAIMS

I turn to plaintiffs' cross-appeal, in which they assign error to the trial court's indication on the verdict form that plaintiffs' duty of loyalty claims failed if "a majority of the disinterested board members who voted" authorized the decision. Because the same legal issue would be likely to arise on remand, I address it as well. I provide factual background here as necessary to understand the parties' arguments and my analysis.

The following facts are undisputed. During the relevant time period, from early 2009 to early 2010, defendants Kim and Juhola were directors of Deep Photonics Corporation (DPC). Kim also owned 90 percent of Daehong Technew Corporation, a Korean corporation. Defendant Knoth was a shareholder and attended board meetings throughout the relevant time period, and he became a director in May 2009. In addition to defendants, LaChapelle, Theodore Alekel, and Mike Kelly were directors of DPC. Until early September 2009, LaChapelle was DPC's president and chief executive officer. Thus, after May 2009, DPC had six directors: defendant Kim, defendant Juhola, defendant Knoth, Alekel,[3] Kelly—who was not a party to any of the claims in this litigation—and plaintiff LaChapelle.

In the claims at issue here, plaintiffs contended that defendants and Alekel had breached their duty of loyalty to

_____

[3] Alekel was named as a defendant on the claims at issue here, but the claims against him were severed before trial and eventually dismissed. As a general matter, he was aligned with defendants.

DPC in making three decisions. First, plaintiffs challenged the board's decision, in August 2009, to cease operations in Corvallis, where all of the company's operations had taken place, and pack up and ship all work in progress to Kim's company, Daehong Technew, in Korea. Second, plaintiffs challenged the board's decision, in September 2009, to name Alekel president and chief executive officer of DPC. Third, plaintiffs challenged the board's decision, in January 2010, to approve a renegotiated loan agreement with Daehong Technew, under which DPC agreed to give Daehong Technew a security interest in its intellectual property.

Plaintiffs presented evidence that Kim, Juhola, Knoth, and Alekel had conflicts of interest with regard to the three decisions. They also presented evidence that defendants and Alekel conspired to take a series of actions, including the removal of LaChapelle as president and CEO, the three actions identified above, and additional actions, that were intended to benefit themselves personally and that destroyed DPC's potential for success.

The first challenged decision was approved by a majority of the six directors including Kim, Juhola, Knoth, Alekel, and Kelly.[4] The second and third decisions were approved unanimously by the same directors; LaChapelle was not at the meetings.

With those background facts in mind, I consider the Delaware law that governs the parties' dispute. Then I set out the relevant portions of the disputed verdict form.

Two aspects of Delaware law regarding conflicts of interest are relevant here: first, voidability of a corporate decision when a majority of the directors who voted for it have conflicts of interest, and second, the elements of a common-law breach of fiduciary duty claim. Historically, in Delaware, "a contract or transaction in which a majority of voting directors or officers had an interest was generally presumed to be voidable." Blake Rohrbacher, John Mark Zeberkiewicz, & Thomas A. Uebler, *Finding Safe Harbor: Clarifying the Limited Application of Section 144*, 33 Del J

---

[4] At trial, the parties disputed whether LaChapelle had voted in favor of the decision to move operations to Korea.

Corp L 719, 722 (2008); *see also, e.g.*, *Oberly v. Kirby*, 592 A2d 445, 466 (Del 1991) ("At common law, a corporation's stockholders did have the power to nullify an interested transaction[.]"). To change that situation, in 1967, the Delaware General Assembly enacted 8 Delaware Code section 144, which now provides, as follows:

> "(a)   No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable *solely for this reason* \*\*\* if:

> "(1)   The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum[.]"

(Emphasis added.) Thus, compliance with section 144(a)(1)—including authorization of a corporate contract or transaction by "the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum"—prevents a transaction from being held "void or voidable" "solely" because the directors or officers have conflicts of interest.[5]

However, the fact that section 144 saves a transaction from voidability based "solely" on the existence of a conflict of interest does not prevent a court from considering the separate question of whether the directors or officers nevertheless breached their fiduciary duties by approving it. *In re Cox Communications, Inc. Shareholders Litigation*, 879 A2d 604, 614-15 (Del Ch 2005) (Section 144 "has been interpreted as dealing solely with the problem of per se invalidity; that is, as addressing only the common law principle that interested transactions were entirely invalid \*\*\*. The somewhat different question of when an interested transaction might give rise to a claim for breach

---

[5] The parties have not addressed whether the board decisions at issue were contracts or transactions within the meaning of section 144 or whether the other requirements of that section were met, and I do not address those questions.

of fiduciary duty—*i.e.*, to a claim in equity—was left to the common law of corporations to answer. Mere compliance with [section] 144 did not necessarily suffice"); *see also, e.g.,* *Fliegler v. Lawrence*, 361 A2d 218, 222 (Del 1976) ("[Section 144] merely removes an 'interested director' cloud when its terms are met and provides against invalidation of an agreement 'solely' because such a director or officer is involved."); *Zimmerman v. Crothall*, 62 A3d 676, 704-05 (Del Ch 2013) ("Section 144 *** addresses the common law rule or concept that self-interested transactions with a director's corporation were void or voidable."); *Cumming v. Edens*, No. 13007-VCS, 2018 WL 992877 at \*22 (Del Ch Feb 20, 2018) ("Based on the plain language of the statute, and my reading of the persuasive authority on the subject, I am satisfied that compliance with Section 144(a)(1) does not *necessarily* invoke business judgment review of an interested transaction. The Court must still adhere to settled common law principles when fixing the appropriate standard of review by which fiduciary conduct should be measured." (Emphasis in original; footnote omitted.)); *CDX Liquidating Trust v. Venrock Associates*, 640 F3d 209, 219 (7th Cir 2011) (noting that compliance with section 144(a)(1) does not answer accusations of disloyalty and collecting Delaware cases; "a disloyal act is actionable even when a conflict of interest is not"); Leo E. Strine, Jr., Lawrence A. Hamermesh, R. Franklin Balotti, & Jeffrey M. Gorris, *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo L J 629, 656 n 85 (2010) ("To date, the Delaware courts have generally read [section 144] more narrowly[—as simply preventing a transaction from being void or voidable solely because of a conflict of interest—]while drawing on it in crafting rulings in equity."); R. Franklin Balotti & Jesse A. Finkelstein, 1 *Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations* § 4.16[A] (2020) ("Apart from the statutory safe-harbor analysis [of section 144], the courts also scrutinize interested-director transactions under a common-law fiduciary review.").

Some Delaware cases have suggested that, if a transaction is approved as contemplated in section 144(a)(1), the transaction will be reviewed under the business

judgment rule rather than for entire fairness to the corporation.[6] *See, e.g.*, *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A2d 114, 120 (Del 2006) ("After approval by disinterested directors, courts review the interested transaction under the business judgment rule."). However, the majority view among Delaware cases—and, in my opinion, the only view that is faithful to the text of section 144—is that "section 144 does not play any role in determining which standard of review applies." Rorbacher, et al., 33 Del J Corp L at 736.[7]

Here, plaintiffs contended that defendants had breached their fiduciary duties—specifically, as relevant here, their fiduciary duty of loyalty—not that the challenged actions were voidable or void because of conflicts of interest. Thus, the verdict form needed to lead the jury through the proper analysis for a claim of breach of the duty of loyalty.

Although the standards for the statutory analysis under section 144 and the common-law question of whether the board has breached its duty of loyalty "are phrased similarly," "they are in fact quite different." *Id.* at 737-38. As set out above, under section 144(a)(1), a transaction is saved

---

[6] The business judgment rule is a substantive "standard of review" that creates a presumption in favor of the validity of the action of a corporation's board of directors. If the plaintiff rebuts the application of the business judgment rule, a court applies the "entire fairness" standard of review instead, reviewing the transaction to evaluate whether it is entirely fair to the corporation. *Krasner v. Moffett*, 826 A2d 277, 287, 287 n 40 (Del 2003).

[7] I also note that this case is factually distinguishable from *Benihana of Tokyo, Inc.* As another court summarized,

"*Benihana of Tokyo, Inc.*, a derivative suit much like this one, provides an illuminating contrast to this case. A director was interested but his interest was known to the board. Having settled that point, the court went on to consider whether he had breached his fiduciary duty to the corporation, and concluded that he had not. He 'did not set the terms of the [challenged] deal; he did not deceive the board; and he did not dominate or control the other directors' approval of the Transaction. In short, the record does not support the claim that [he] breached his duty of loyalty.' *Id.* at 121."

*CDX Liquidating Trust*, 640 F3d at 219 (citation omitted).

Here, plaintiffs not only presented evidence that four of the five directors that voted in favor of each decision had conflicts of interest, they also presented evidence that those directors conspired to take those actions from motives of personal gain rather than to protect the corporation's interests. To the extent that approval under section 144 could potentially entitle directors to review under the business judgment rule under some circumstances, plaintiffs' evidence here makes review under the business judgment rule inapposite.

from voidability if, among other requirements, the board ratifies the conflicted transaction "by the affirmative votes of a majority of the disinterested directors." By contrast, in a common-law claim for breach of the duty of loyalty, like the claims that plaintiffs raised here, the plaintiff rebuts the application of the business judgment rule "when the majority of a board of directors is the ultimate decisionmaker and a majority of the board is interested in the transaction." *Krasner v. Moffett*, 826 A2d 277, 287 (Del 2003); *see also, e.g.*, *Puma v. Marriott*, 283 A2d 693, 693-95 (Del Ch 1971) (concluding that the business judgment rule applied because the challenged transaction had been approved by the five outside directors, who formed a majority of the nine-member board and who were not alleged to have conflicts of interest).

To put the difference between those two standards in context, consider the example of a nine-member board of directors, eight of whom have conflicts of interest in a given action. "[A] nine-member board with a single disinterested director may approve a covered transaction and reap the benefits of the section 144 safe harbor." Rorbacher, et al., 33 Del J Corp L at 737. That is, the vote of the single disinterested director saves the transaction from being voidable even though eight of the nine directors have conflicts of interest.

By contrast, in a common-law claim for breach of the duty of loyalty, "a transaction approved by the nine-member board discussed above (with the single disinterested director) will be subject to the entire-fairness standard." *Id*. That is so because a majority of the directors who are approving the transaction—eight of the nine total directors—have conflicts of interest. Because "a majority of the board is interested in the transaction," the board action is not entitled to the protection of the business judgment rule; instead, a court will evaluate the action for entire fairness to the corporation. *Krasner*, 826 A2d at 287; Rorbacher, et al., 33 Del J Corp L at 737. Thus, section 144 "is best seen as establishing a floor for board conduct"—compliance prevents a board action from being voidable—"but not a ceiling," in the sense that compliance with section 144 does not, in and of itself, prevent a court from reviewing the substance of the

transaction for entire fairness. *HMG/Courtland Properties, Inc. v. Gray*, 749 A2d 94, 114 n 24 (Del Ch 1999).

Next, I consider the verdict form that plaintiffs challenge. On the parts of the verdict form relating to defendants' breaches of the duty of loyalty, the jury was asked a series of questions similar to the following about each of the challenged decisions:

"1. Did any defendant breach his duty of loyalty?

"__ Yes __ No

"If no, go to questions concerning [the next challenged decision]. If yes, go to next question.

"2. Did at least [a majority of the board, consisting of either three or four directors, depending on the decision] violate their duty of loyalty?

"__ Yes __ No

"At least nine of the same jurors who answered yes to question 1, must agree on the answer to question 2. If no, go to questions concerning [the next challenged decision]. If yes, go to next question.

"3. Did the defendants prove that a majority of the disinterested board members who voted authorized the decision?

"__ Yes __ No

"At least nine of the same jurors who answered yes to question 2, must agree on the answer to question 3.

"If you answer yes, go to the questions concerning [the next challenged decision]. If you answer no, go to question 4.

"4. Did the defendants prove the decision was entirely fair to the corporation?

"__ Yes __ No

"At least nine of the same jurors who answered no to question 3, must agree on the answer to question 4.

"If you answer yes, go to the questions concerning [the next challenged decision]. If no, you need to answer the

questions about this transaction in the damage section of this form."

With respect to each of the three breaches of the duty of loyalty, the jury answered "yes" to questions 1 and 2, finding that a majority of the board of directors had breached their duty of loyalty.

The jury also answered "yes" to question 3, indicating that defendants had proved "that a majority of the disinterested board members who voted authorized the decision." The parties agree that that answer was based on the fact that Kelly was the only disinterested director, and he voted in favor of the challenged decisions.

On appeal, plaintiffs contend that the trial court erred by including the third question on the verdict form. I agree.

Because the single disinterested director voted in favor of each action, each action complied with the voting requirement of section 144(a)(1) and, consequently, was not voidable solely because of the conflicts of interest.[8] But plaintiffs did not claim that the challenged actions were voidable solely because of the conflicts of interest; to the contrary, they asserted, and presented evidence, that defendants had breached their duty of loyalty by conspiring to take actions that put their own personal interests above those of DPC. As explained above, compliance with section 144(a)(1) does not excuse breaches of the duty of loyalty. Rorbacher, et al., 33 Del J Corp L at 721 ("[I]f a transaction complies with the section 144 safe harbor, it will not be invalidated solely on the grounds of the offending interest, but will be analyzed under the common law regarding breach of fiduciary duty. Section 144 will then have nothing more to do with the transaction."); *see also, e.g.*, *CDX Liquidating Trust*, 640 F3d at 219 ("[The defendant directors] persuaded the district judge that disclosure of a conflict of interest [and compliance with section 144] excuses a breach of fiduciary duty. It does not. It just excuses the conflict.").

---

[8] As noted above, 303 Or App at 732 n 7 (James, J., concurring in part and dissenting in part), plaintiffs did not, and do not, contend that the board actions did not comply with the other requirements of section 144(a)(1), relating to full disclosure of the conflicts and good faith. Accordingly, I express no opinion on those questions.

Instead, "when the majority of a board of directors is the ultimate decisionmaker and a majority of the board is interested in the transaction, the presumption of the business judgment rule is rebutted." *Krasner*, 826 A2d at 287; *see also Malpiede v. Townson*, 780 A2d 1075, 1094 n 65 (Del 2001) ("If the plaintiff were to establish by proof at trial a *prima facie* case of a loyalty violation, defendants would then have the burden to establish entire fairness."). The fact that a majority of the disinterested directors voted in favor of the challenged actions does not govern the outcome of plaintiffs' duty-of-loyalty claims. I thus conclude that the trial court erred in denying plaintiffs' objection to a verdict form that instructed the jury to end its evaluation of plaintiffs' loyalty claims if it found that "a majority of the disinterested board members who voted authorized the decision," and I would reverse on the cross-appeal.

Accordingly, I dissent in part and concur in part in the majority opinion.